Rockingham
No. 2010-015

ADELAIDE V. GEORGE d/b/a HOMES BY GEORGE & a.

v.

AL HOYT & SONS, INC.

Argued: February 10, 2011
Opinion Issued: June 2, 2011

*MacMillan Law Offices*, of Bradford, Massachusetts (*Thomas K. MacMillan* on the brief and orally), for the plaintiffs.

*Sumner F. Kalman, Attorney at Law, P.C.*, of Plaistow (*Thea S. Valvanis* and *Sumner F. Kalman* on the brief, and *Mr. Kalman* orally), for the defendant.

HICKS, J. The plaintiffs, Adelaide V. George d/b/a Homes by George (Homes by George) and Rick George, appeal, and the defendant, Al Hoyt & Sons, Inc., cross-appeals, from rulings of the Trial Court (*McHugh*, J.). We affirm in part, vacate in part, and remand.

The record supports the following facts and procedural history. Homes by George was the developer of a residential real estate development known as Esther's Estates in Newton. Rick George, Adelaide George's son, worked for Homes by George building houses for the development. Esther's Estates was financed by loans from EML Builders, which were secured by a mortgage on the property.

On December 13, 2001, Rick, on behalf of Homes by George, entered into a written contract with the defendant in which the defendant agreed to perform certain work in connection with the Esther's Estates development, including building a road. The contract specified a total price of $79,278.31.

In January and February 2002, the defendant began work on Esther's Estates. On February 15, the plaintiffs paid the defendant $10,500 as a deposit for a bridge that was necessary to complete the road and, ultimately, the development of Esther's Estates. Pursuant to the plaintiffs' wetlands permit, the bridge had to be installed by July 2002. In June 2002, a disagreement arose between the parties as to whether the contract required the defendant to construct and install the bridge as part of the road construction. That same month, the defendant informed the plaintiffs that it would not construct and install the bridge. Shortly thereafter, the plaintiffs entered into a contract with Concrete Systems, Inc. for the purchase of a bridge for $21,140 but learned that it would take three months for the bridge to be built.

As a result of the delay in installation of the bridge, the plaintiffs returned deposits to two prospective purchasers of homes to be built in Esther's Estates and voided their respective purchase and sale agreements. The plaintiffs had planned to use the profits from these sales to pay down the mortgage with EML Builders and to continue with the project. However, after learning that the bridge would not be installed in July, Leo LaRochelle, the president of EML Builders, "called the note" because "performance wasn't being done" and the plaintiffs were not paying him. Consequently, on August 22, the plaintiffs transferred Esther's Estates to EML Builders via a deed in lieu of foreclosure for the amount of $300,000.

In May 2005, the plaintiffs sued the defendant, alleging breach of contract in that the defendant had "failed to complete the road in a good,

workmanlike or timely manner, including the acquisition, installation and oversight of the construction of the . . . bridge." The plaintiffs further alleged that the defendant committed certain unfair and deceptive business practices in violation of the New Hampshire Consumer Protection Act (CPA), see RSA ch. 358-A (2009 & Supp. 2010), and unlawfully removed loam and other top soils from Esther's Estates. The defendant counterclaimed, alleging that the plaintiffs breached the parties' agreement by failing to pay amounts due under the contract and that the plaintiffs had been unjustly enriched.

The trial court bifurcated the proceedings to allow a jury to first determine the liability claims. A jury trial was held in May 2008 and the jury returned a verdict in favor of the plaintiffs on all liability claims. The defendant unsuccessfully moved to set aside the jury's verdict on the plaintiffs' breach of contract and CPA claims. Thereafter, the trial court notified the parties that it would determine damages on the CPA claims.

In March 2009, a jury trial was held on damages with respect to the breach of contract and unlawful removal of loam claims. The jury awarded the plaintiffs $835,000 for the breach of contract claim and $14,400 for the unlawful removal of loam claim. The defendant filed a motion for remittitur, judgment notwithstanding the verdict and to set aside the damages verdict. The court set aside the jury's $835,000 award but upheld the $14,400 award. The court then scheduled another jury trial on damages for the plaintiffs' breach of contract claim.

Shortly thereafter, the plaintiffs filed a motion seeking to have the judge recuse himself from any further proceedings in the case. The plaintiffs also moved for an award of attorney's fees under the CPA. The trial court denied the motion to recuse and awarded the plaintiffs $5,000 in attorney's fees for the prosecution of their CPA claim. See RSA 358-A:10 (2009).

In October 2009, another jury trial was held on damages and the jury awarded the plaintiffs $500,000 for their breach of contract claim. The trial court set this award aside and instead awarded the plaintiffs damages of $56,680, comprised of $42,280 as double damages under the CPA for the cost of the bridge and $14,400 for the unlawful removal of loam. The plaintiffs moved to reconsider the court's damages award and earlier award of attorney's fees. The court denied the motion as to damages but increased the award of attorney's fees to $25,000. This appeal followed.

On appeal, the plaintiffs argue that the trial court erred in: (1) vacating the jury's verdict on damages and substituting its own damages award; (2) calculating damages and attorney's fees under the CPA; and (3) denying their motion to recuse. The plaintiffs also claim that the trial court improperly communicated with the jury.

The defendant cross-appeals, arguing that: (1) the trial court erred in its application of the CPA to the facts of this case; (2) the plaintiffs are not entitled to any damages for the removal of loam; and (3) the first jury's breach of contract finding was conclusively against the weight of the evidence. We first address the defendant's cross-appeal and then turn to the plaintiffs' appeal.

*I. Defendant's Cross-Appeal*

*A. CPA Claim*

The defendant challenges the trial court's application of the CPA to the facts of this case. First, the defendant argues that the plaintiffs are not entitled to bring a private cause of action under the CPA because Homes by George was "an 'experienced' development company . . . and not a 'consumer.' " To address this argument, we must interpret the CPA, which is a question of law that we review *de novo. Green Mt. Realty Corp. v. Fifth Estate Tower*, 161 N.H. 78, 82 (2010).

"On questions of statutory interpretation, this court is the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole." *Milford Lumber Co. v. RCB Realty*, 147 N.H. 15, 17 (2001) (quotation omitted). We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. *State v. Merrill*, 160 N.H. 467, 471 (2010). In conducting our analysis we will focus on the statute as a whole, not on isolated words or phrases. *Milford Lumber Co.*, 147 N.H. at 17. We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. *Green Mt. Realty Corp.*, 161 N.H. at 82.

■ RSA 358-A:2 (2009) states that "[i]t shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." The CPA broadly defines who may bring a private action as *"[a]ny* person injured by another's use of any method, act or practice declared unlawful under this chapter." RSA 358-A:10, I (emphasis added); *see Milford Lumber Co.*, 147 N.H. at 17. "Person" also is defined broadly to include "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity." RSA 358-A:1, I (2009); *see Milford Lumber Co.*, 147 N.H. at 17. Thus, by its plain language, the CPA clearly provides a private right of action to business entities. Likewise, nothing in the language of the statute suggests that the legislature intended to preclude "experienced" business entities from the protections afforded by the CPA.

In support of its argument that Homes by George, as "an 'experienced' development company," is not a consumer entitled to protection under the CPA, the defendant relies on the definition of "consumer" in RSA 491:7-a (2010). RSA 491:7-a, however, governs the business and commercial dispute docket in superior court, and not the CPA. Moreover, had the legislature intended to limit the protections of the CPA to the definition of "consumers" as espoused by the defendant, it could have expressly done so as it did in RSA 491:7-a.

The defendant next contends that it did not engage in any unfair and deceptive acts under the CPA. "The trial court's findings of fact and rulings of law will be upheld unless they lack evidentiary support or constitute clear error of law." *Barrows v. Boles*, 141 N.H. 382, 389 (1996) (quotation omitted).

■ We have previously recognized that the general provision of the CPA, RSA 358-A:2, is broadly worded, and not all conduct in the course of trade or commerce falls within its scope. *ACAS Acquisitions v. Hobert*, 155 N.H. 381, 402 (2007). "An ordinary breach of contract claim, for example, is not a violation of the CPA." *State v. Sideris*, 157 N.H. 258, 262 (2008). In determining which commercial actions not specifically delineated are covered by the act, we have employed the "rascality" test. *Id.* at 263. Under the rascality test, the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce. *Hobert*, 155 N.H. at 402.

Here, the trial court found that RSA 358-A:2 applied to the defendant's conduct. Specifically, the court found that "a jury could conclude that one who bills a customer as part of a written contract for a $10,000.00 [*sic*] deposit towards the construction of a bridge and does not remit said sum to bridge manufacturer has committed an act that would attain a level of rascality." The trial court compared the defendant's conduct in this case to that of the defendant in *Sideris*.

In *Sideris*, the defendant was convicted of committing an unfair or deceptive business act or practice in violation of the CPA. *Sideris*, 157 N.H. at 261. There, the defendant had entered into a contract with a homeowner to perform roof work and had received a deposit for the work. *Id.* at 260. Thereafter, the defendant failed to purchase materials, produce proof of insurance, obtain a building permit or otherwise begin work as promised. *Id.* Despite the defendant's subsequent assurances to the homeowner that he would return the homeowner's money, as well as *further interactions* with the homeowner and the Manchester police, the defendant did not return the money or repair the homeowner's roof. *Id.* at 260-61.

On appeal, the defendant contended that the trial court erred in denying his motion to dismiss on the grounds that there was insufficient evidence to demonstrate that his conduct was so egregious as to violate the CPA. *Id.* at 262-63. We disagreed and concluded that the defendant's conduct of inducing the homeowner to enter into a contract with no intention of performing the work and thereafter misrepresenting that he would return the deposit money was sufficiently egregious as to constitute a violation of the CPA. *Id.* at 263.

We agree with the trial court that the defendant's conduct in this case is similar to the defendant's conduct in *Sideris*. In this case, the defendant entered into a contract with the bridge manufacturer for the fabrication of a bridge in January 2002. Thereafter, the defendant billed the plaintiffs $10,500 as a deposit for the bridge. In February 2002, the defendant received that amount as payment for the deposit but never remitted the deposit to the bridge manufacturer. At the liability trial, David Hoyt testified on behalf of the defendant that he took the deposit and "put it towards the road." While he testified that he told the plaintiffs that he put the $10,500 towards the road, Adelaide testified that she repeatedly asked the defendant about the progress of the bridge and was told that the defendant was working on it. Both she and Rick testified that it was not until June 2002 that the defendant informed the plaintiffs that it would not be installing the bridge. "When there is conflicting testimony, we defer to the findings of the trier of fact unless no reasonable person could have come to the same conclusion." *Barrows*, 141 N.H. at 390-91 (quotation omitted). Here, the record supports the trial court's finding that the defendant's conduct in this case was similar to that of the defendant in *Sideris*. *See Sideris*, 157 N.H. at 264. Accordingly, we conclude that the trial court did not err in its application of the CPA to the facts of this case.

### B. Unlawful Removal of Loam

The defendant next challenges the award of damages for the removal of loam. It maintains there was evidence that in the sequence of road construction, loam spreading and seeding is normally done at the end of the project, and because it did not finish the road before the August 22, 2002 conveyance date, the loam would not have yet been spread. Thus, according to the defendant, the plaintiffs "cannot collect damages for the loam, the road not being paved, or any other outstanding contract item that was not required to be completed by [the] August 22, 2002, conveyance date."

The trial court found that the "jury's verdict for removal of loam does have a factual basis." The court further found "that the defendant's claim of impossibility of performance and commercial frustration effectuated by the

plaintiff[s'] conveyance of the property on August 22, 2002 has no bearing on this portion of the plaintiff[s'] complaint for damages." We agree.

■ ■ The doctrines of impossibility of performance and commercial frustration presume the existence of a contract. *See Appeal of Vicon Recovery Systems, Inc.,* 130 N.H. 801, 805 (1988) (doctrines of commercial frustration and impossibility of performance did not apply because the party's obligations did not arise out of a contract). Here, the plaintiffs sought damages for the removal of loam under a count of trespass. This count was separate and apart from the plaintiffs' breach of contract count and the defendant's obligations under the contract. Because the doctrine of commercial frustration does not apply to a plea of trespass, this defense is not available to the defendant.

■ To the extent the defendant argues that the trial court should have granted remittitur as to the $14,400 verdict, we find no error. Whether remittitur should be granted is within the trial court's sound discretion. *Blouin v. Sanborn,* 155 N.H. 704, 707 (2007). Direct review of a damages award is the responsibility of the trial judge, who may disturb a verdict as excessive (or inadequate) if its amount is conclusively against the weight of the evidence. *Id.* The amount of the verdict is conclusively against the weight of the evidence only if no reasonable jury could have reached it. *Id.* Our task upon review is not to attempt to ascertain the one and only correct verdict. *Id.* Absent an unsustainable exercise of discretion, we will not reverse the trial court's decision. *Id.* The party seeking to modify the verdict bears a heavy burden. *Id.*

■ Adelaide and Rick testified that the defendant removed loam from the property and that they did not see the loam returned to the property. This testimony was unrefuted. Further, Rick testified as to the cost of a cubic yard of unscreened loam in 2002. The plaintiffs' engineer testified as to his estimate of the amount of loam removed from the roadway. We conclude that the trial judge sustainably exercised his discretion by not disturbing the award of $14,400 for this removal.

*C. Contract Liability*

Finally, the defendant argues that "[t]he written contract dated December 13, 2001 does not include a '. . . bridge'" and, thus, the first jury's liability finding that the contract required the defendant to construct a bridge was "'conclusively against the weight of the evidence, and one no reasonable jury could return.'" We note that the defendant does not raise an argument on appeal concerning the admission of parol evidence and,

therefore, we address only whether the jury's finding that the contract required the defendant to construct a bridge was conclusively against the weight of the evidence.

"We will set aside a jury verdict if it is conclusively against the weight of the evidence or if it is the result of mistake, partiality, or corruption." *Quinn Bros. v. Whitehouse*, 144 N.H. 186, 190 (1999) (quotations omitted). "Conclusively against the weight of the evidence should be interpreted to mean that the verdict was one no reasonable jury could return." *Id.* (quotation omitted). We will uphold the trial court's decision on a motion to set aside the verdict unless the decision was made without evidence or the court committed an unsustainable exercise of discretion. *Babb v. Clark*, 150 N.H. 98, 100 (2003); *see State v. Lambert*, 147 N.H. 295, 296 (2001) (explaining unsustainable exercise of discretion standard). Since the defendant argues only that the jury verdict was against the weight of the evidence, we limit our review accordingly.

█ The record in this case belies the defendant's argument. There was more than sufficient evidence to support the jury's verdict that the contract required the defendant to construct a bridge. Adelaide and Rick testified that the defendant was responsible for constructing the bridge and that they believed the bridge was included in the contract price. Adelaide further testified that the defendant billed the plaintiffs for the bridge deposit and subsequently accepted the deposit amount. David Hoyt testified that he entered into a contract with the bridge manufacturer, on behalf of the defendant, for the construction of a bridge and, at that time, he was aware that a bridge was required. Accordingly, we conclude that the verdict was not conclusively against the weight of the evidence and affirm the trial court's denial of the defendant's motion to set aside this portion of the liability verdict.

## II. Plaintiffs' Appeal

### A. Breach of Contract Damages

The plaintiffs argue that the trial court erred in vacating the jury's verdict of $500,000 on their breach of contract claim and substituting its own award of $56,680. The plaintiffs maintain that the $500,000 award was "fully supported by the evidence presented at trial." We note that the plaintiffs do not appeal the trial court's ruling setting aside the earlier verdict for $835,000.

We first address the plaintiffs' contention that the trial court's award of $56,680 was a substitute for the jury's award of $500,000. In its order setting aside the $500,000 damages verdict, the trial court found that

"[b]ecause two juries have clearly determined that the plaintiff[s] should recover maximum provable damages, it is those damages that [they] will be awarded by the Court." The court then explained:

> Upon consideration of all of the evidence in a light most favorable to the plaintiff[s], the Court awards [them] a verdict in the total sum of $56,680.00 plus reasonable attorney fees. The breakdown of the Court's award is as follows. The first jury determined that the cost of the . . . bridge was included in the contract between the parties, but that cost was not paid by the defendant. There is no dispute that this cost was $21,140.00. The first jury also determined that the taking of a deposit for that bridge by the defendant and not forwarding it to the bridge manufacturer was a violation of RSA 358-A. Accordingly the Court doubles that cost and awards total bridge damages of $42,280.00. The first jury also found the defendant removed some loam, and the value of that loam was determined to be $14,400.00. When said sum [is] added to the verdict the total becomes $56,680.00.

While the court referred to the $21,140 as being included within the contract as the cost of the bridge, it appears that the court intended its award of this amount to be an award of damages for the plaintiffs' CPA claim. This is evinced by the court's doubling of such award. Accordingly, we interpret the court's final damages award of $56,680 as a verdict for the plaintiffs on their CPA and removal of loam claims and not as a substitute for the jury's $500,000 breach of contract verdict. *See State v. Parker*, 155 N.H. 89, 91-92 (2007) (explaining that interpretation of a trial court order is a question of law which we review *de novo*).

██ We next address whether the court erred in setting aside the jury's $500,000 verdict. As stated above, "a jury's verdict may only be set aside if it is conclusively against the weight of the evidence or if it is the result of mistake, partiality, or corruption." *Guyotte v. O'Neill*, 157 N.H. 616, 620 (2008). Here, the trial court determined that the $500,000 verdict "had no relation to any of the evidence in the case." For a verdict to be conclusively against the weight of the evidence it must be one no reasonable jury could return. *Id.* We will not overturn the trial court's decision on a motion to set aside the verdict unless it is without evidence or an unsustainable exercise of discretion. *Babb*, 150 N.H. at 100.

The plaintiffs argue that the failure to build the bridge was a breach of the contract between the parties, and, therefore, they "were entitled not only to the return of the deposit, but the cost of the . . . bridge in addition to consequential damages flowing from the breach." They contend "that

there was competent evidence from [them] on the issue of consequential damages," including evidence of the cost of the bridge deposit, the total bridge cost, lost profits and the value of the development at the time they deeded the property to EML Builders in lieu of foreclosure.

█ We have "held that consequential damages that could have been reasonably anticipated by the parties as likely to be caused by the defendant's breach are properly awarded to the non-breaching party in a contract action." *Robert E. Tardiff, Inc. v. Twin Oaks Realty Trust*, 130 N.H. 673, 677 (1988) (quotations omitted). The requirement of reasonable foreseeability may be satisfied in either of two ways: (1) as a matter of law if the damages follow the breach in the ordinary course of events; or (2) by the claimant specifically proving that the breaching party had reason to know the facts and to foresee injury. *Petrie-Clemons v. Butterfield*, 122 N.H. 120, 124 (1982). "[T]he goal of damages in actions for breach of contract is to put the non-breaching party in the same position it would have been in if the contract had been fully performed." *Robert E. Tardiff, Inc.*, 130 N.H. at 677 (quotations omitted); *see Hawkins v. McGee*, 84 N.H. 114, 117 (1929).

In this case, Adelaide testified that, after the defendant informed the plaintiffs that it would not install the bridge, the plaintiffs lost the sales and hence the profit from two houses that were to be built on lots in Esther's Estates. She presented uncontradicted testimony that the defendant knew from the start that the plaintiffs had those two lots under contract and that the plaintiffs "had to have th[e] bridge in in June." Thus, the defendant should have realized that the failure to install the bridge in a timely manner could result in lost profits for the plaintiffs.

█ The trial court found that the jury's verdict was unreasonable, in part, because "there was no testimony as to how much lost profit specifically was applicable to the two lots that were the subject of this award." New Hampshire law, however, does not require that damages be calculated with mathematical certainty, and the method used to compute them need not be more than an approximation. *Akwa Vista v. NRT*, 160 N.H. 594, 602 (2010). "We will uphold an award of damages for lost profits if sufficient data existed indicating that profits were reasonably certain to result." *Petrie-Clemons*, 122 N.H. at 125.

Here, Adelaide testified that the two purchase and sale contracts were for $277,900 and $276,900 and that the expected profit on each of the two houses was between $100,000 and $125,000 but no less than $100,000. She further testified that the plaintiffs had already built thirteen houses in the earlier phases of Esther's Estates and that the profit margin for those

houses was at least $100,000. Based upon this evidence, we find that the plaintiffs' lost profits on these two houses were reasonably certain.

 The trial court further found the verdict unreasonable because the purchase and sale agreements for the two lots expired in 2001, before the time in which "the defendant was required to install the . . . bridge," and "[n]either of the prospective lot purchasers executed extensions to their written contracts." The court is correct that the date for transfer of title in the purchase and sale agreements had expired before the time period in which the defendant was required to install the bridge, and that neither contract was extended in writing. However, the plaintiffs offered testimony at trial indicating that both purchasers orally agreed to extend the time for performance. *Cf. Warren v. Dodge*, 83 N.H. 47, 49 (1927) (performance or reliance on an oral modification of contract required by statute of frauds to be in writing sustains the modification "when carried into effect on principles of accord and satisfaction and of estoppel"). Indeed, Adelaide testified that she returned the deposits to the two prospective purchasers in June 2002 after learning that the defendant was not going to order and install the bridge. Moreover, neither contract specified that time was of the essence with respect to time for performance. *See Guy v. Hanley*, 111 N.H. 73, 75 (1971) ("The general rule is that unless specifically so stated, time is not to be considered as of the essence" and "[t]he mere fact that a date is stated in the instrument is not sufficient alone to alter this rule."). There is evidence in the record from which a reasonable jury could have found lost profit damages between $200,000 to $250,000.

However, even assuming that the plaintiffs also presented sufficient evidence to support breach of contract damages in the amount of the cost of the bridge deposit and the total bridge cost, the jury's $500,000 verdict is unsustainable unless the plaintiffs proved that they were entitled to damages for the value of the property the plaintiffs lost on the deed transfer. The plaintiffs argue that the evidence supports an award of damages up to $1,003,700 for the value of the property they lost on the deed transfer.

The trial court's ruling with respect to this portion of damages is unclear. In its initial order setting aside the verdict, it ruled that there was "no rational basis" for the jury to find that the plaintiffs proved damages for the value of the property they lost on the deed transfer. At the conclusion of the same order, however, the trial court observed that:

> The evidence clearly showed that the plaintiff[s] in this case did not take any reasonable steps to mitigate [their] damages. [They] made the reckless business decision to surrender [their] property to the man who had loaned [them] money in order for [them] to

develop it. The decision to surrender the property was only 30 days after the defendant would have been able to have installed the . . . bridge. Moreover, the tax stamps on the deed from the plaintiff[s] to [their] banker reflected the consideration of the transfer to be $300,000.00. Yet at trial the plaintiff[s] produced evidence from an appraiser that the property was actually worth $1 million dollars at the time of the transfer. Thus the defendant's breach of contract did not cause the plaintiff[s] to suffer what may well have been a loss of $700,000.00. The plaintiff[s'] decision to in effect give away [their] property was an intervening, super[s]eding cause. Because a plaintiff must prove the amount of damages and must prove they were caused by the actions or inactions of a defendant, the plaintiff[s] simply cannot meet [their] burden on either one of these elements in this case.

Thus, the court's order initially indicates that the plaintiffs failed to present sufficient evidence to prove damages for the value of the lost property. It then suggests that the plaintiffs presented evidence of damages for the value of the property lost on the deed transfer but failed to mitigate their damages. Finally, the order appears to rely upon the doctrine of commercial frustration; that is, that the plaintiffs' action of deeding the property to LaRochelle in lieu of foreclosure constituted a supervening event which would have destroyed the purpose for which the contract was made relieving the defendant of liability for its actions or inactions.

■ In light of the trial court's arguably conflicting rulings on this aspect of damages and the record submitted on appeal, which fails to provide clarification of the trial court's intent in finding this aspect of damages unsupportable, we vacate the trial court's ruling setting aside the verdict. We remand on this issue for a determination whether the record supports an award of damages beyond the lost profits on the lost home sales.

In view of our ruling above, we need not address the plaintiffs' argument "that the trial court improperly engaged in an ex parte communication with the jury after it reached its decision, but prior to publication, in the second damages trial." We conclude that the trial court's error, if any, respecting this issue is of no consequence. *Cf. Beer v. Bennett*, 160 N.H. 166, 172 (2010) (finding any error on part of trial court harmless where defendant argued that the trial court's decision was based on an erroneous premise because the plaintiff prevailed on other claims which supported the relief ordered by the trial court).

*B. CPA Damages*

The plaintiffs next argue "that [the] trial court's method of computation of damages under the [CPA] claim" was erroneous "because it limited damages only to the amount of the . . . bridge deposit" and did not take into account all of the "actual damages" as provided for by RSA 358-A:10. Specifically, they contend that the computation of damages should have included the cost of the deposit, the cost of the bridge, and all of their consequential damages, including, but not limited to, the $500,000 jury verdict.

Conversely, the defendant argues that the plaintiffs can prove no "actual" bridge damages under the CPA. The defendant contends that the plaintiffs did not pay the full cost of the bridge prior to conveying the property to EML Builders and that any damages incurred after the conveyance are precluded by law. The defendant argues that the plaintiffs "suffered no loss with regard to the cost of the bridge" and "[i]ncluding the cost of the bridge in the RSA 358-A damages calculation was error."

The CPA provides:

> Any person injured by another's use of any method, act or practice declared unlawful under this chapter may bring an action for damages and for such equitable relief, including an injunction, as the court deems necessary and proper. If the court finds for the plaintiff, recovery shall be in the amount of actual damages or $1,000, whichever is greater.

RSA 358-A:10, I. "The trial court's findings of fact and rulings of law will be upheld unless they lack evidentiary support or constitute a clear error of law." *Barrows*, 141 N.H. at 389 (quotation omitted).

Here, contrary to the plaintiffs' assertion, the trial court awarded the plaintiffs the entire cost of the bridge in the amount of $21,140 as damages for their CPA claim. However, the CPA claim related to the defendant's acceptance of the *deposit* for the bridge and its failure to pay the manufacturer for the cost of the bridge or to install the bridge. The CPA claim did not involve the full cost of the bridge. There is no evidence in the record that the plaintiffs in fact paid the entire cost of the bridge nor is there any evidence that they remain liable for the cost of the bridge. On the contrary, the record suggests that the plaintiffs received a $10,500 credit from the defendant for the deposit on the bridge.

Accordingly, since the trial court erred in awarding the plaintiffs damages for the full cost of the bridge, we vacate the award of damages under the CPA and remand to the trial court for a determination of damages to be awarded, if any, under the CPA. We note that the plaintiffs

also argue that they are entitled to consequential damages under the CPA, and that the trial court erred by not awarding them. The parties have not fully briefed, and the trial court has not addressed, the legal issue of whether RSA 358-A:10, I, which permits recovery "in the amount of actual damages," authorizes recovery of consequential damages under the CPA. Given that we are vacating the trial court's award of damages under the CPA, upon remand the parties may direct their arguments concerning consequential damages to the trial court.

The defendant maintains that there was no finding that its "acts constituted a 'willful' or 'knowing' violation of the CPA" to support the trial court's award of double damages. The defendant maintains that since the first jury was never asked nor found that its conduct constituted a willful or knowing violation of the CPA, the plaintiffs were only entitled to recover their actual damages. Although we have vacated the trial court's CPA damages award, because this issue may arise on remand and because both parties discuss it in their briefs, we address it.

The damages provision of the CPA mandates that "[i]f the court finds that the use of the method of competition or the act or practice was a willful or knowing violation of this chapter, it shall award as much as 3 times, but not less than 2 times, such amount." RSA 358-A:10, I. Nothing in this language mandates that a jury shall determine whether the defendant's conduct was a willful or knowing violation of the CPA. We have previously interpreted the word "court" to "refer[] to a judge rather than a jury" and, as such, have found that "under the plain language of the statute, the court is vested with the authority to decide claims brought under RSA chapter 358-A." *Hair Excitement v. L'Oreal U.S.A.*, 158 N.H. 363, 369 (2009).

Here, the first jury determined that the defendant's conduct violated the CPA. The trial court then informed the parties that it would determine damages under the CPA and affirmed the first jury's finding of liability. The court ultimately awarded the plaintiffs double damages for their CPA claim. Implicit in the trial court's award of double damages is a finding that the defendant's conduct was a willful and knowing violation of the CPA.

### C. Attorney's Fees

The plaintiffs next argue that the trial court erred in its award of attorney's fees. The plaintiffs argue that they are entitled to attorney's fees for their CPA claim as well as their common law claims because all claims arise out of a common set of facts. The defendant contends that the plaintiffs' attorney's fees can only be related to the CPA claim.

■ "We will not overturn the trial court's decision concerning attorney's fees absent an unsustainable exercise of discretion." *Blouin*, 155 N.H. at 708. We give substantial deference to a trial court's decision on attorney's fees. *Id.* "A prevailing party may be awarded attorney's fees when that recovery is authorized by statute, an agreement between the parties, or an established judicial exception to the general rule that precludes recovery of such fees." *Id.*

Here, the trial court reviewed the plaintiffs' request for attorney's fees in the context of the entirety of the litigation. The court noted that it had

> found bad faith on the part of the defendant in its acceptance of a deposit for the . . . bridge and its failure to pay the manufacturer for the cost of that item or to install it as the jury has found was something that the defendant was required to do under its contract.

The court recognized that "three jury trials have in fact taken place," however, "each trial was of very limited duration and the issues were not overly complex." Accordingly, "[b]ased upon the degree of the defendant's misconduct," the court awarded the plaintiffs reasonable attorney's fees in the amount of $25,000.

■ After reviewing the record, we find that the trial court's exercise of discretion in awarding the plaintiffs $25,000 in attorney's fees is sustainable. The record supports the plaintiffs' right under the contract to have the defendant order and install the bridge. It further supports the trial court's finding that the defendant acted in bad faith by accepting the bridge deposit and failing to pay the manufacturer for the bridge or install the bridge as required by the contract. The record reveals that the trial court based its award of attorney's fees on the entirety of the litigation and ultimately awarded the plaintiffs slightly over one-third of the total fees requested. The plaintiffs offer no reasons as to why this amount was unreasonable. We find no error in the trial court's adjudication of attorney's fees.

*D. Recusal*

■ Finally, the plaintiffs argue that the trial court erred by denying their motion for recusal because the "trial judge had a latent bias from the outset of the case, reflected by its, sua sponte, bifurcation of the liability and damages portion of the case and ultimately in the setting aside of not one but two special jury verdicts on the issue of damages." The plaintiffs contend that the trial court's "latent bias . . . resulted in the trial court setting aside the second special jury verdict . . . with the substitution of the

trial court's valuation of the case and therefore was an unsustainable exercise of discretion." (Citation omitted.) They also argue that the trial court's grant of a real estate attachment in the amount of $50,000 despite their request for an attachment in the amount of $850,000 following the first jury's award of damages demonstrated bias.

> Whether an appearance of impropriety exists is determined under an objective standard, *i.e.*, would a reasonable person, not the judge [himself], question the impartiality of the court. The test for appearance of partiality is an objective one, that is, whether an objective, disinterested observer, fully informed of the facts, would entertain significant doubt that justice would be done in the case.

*Blevens v. Town of Bow*, 146 N.H. 67, 69 (2001) (quotation omitted). A trial judge is *per se* disqualified when he has pecuniary interests in the outcome, when he has become personally embroiled in criticism from a party before him, when he has heard evidence in secret at a prior proceeding, or when he is related to a party. *Sherryland v. Snuffer*, 150 N.H. 262, 268-69 (2003). The party claiming bias must show its existence or likelihood, or the appearance of bias such that the judge would be unable to achieve the balance between vindicating the interests of the court and the interests of a party. *Id.* at 269.

In this case, none of the *per se* disqualifications apply, and the plaintiffs identify no facts from which a reasonable person could infer the existence, likelihood or appearance of bias. The mere fact that the trial court rendered adverse rulings against the plaintiffs does not serve as evidence of the judge's partiality. *See State v. Bader*, 148 N.H. 265, 271 (2002). Moreover, the fact that the court may have granted an attachment or reduced the amount of the verdict in error is not, in and of itself, a basis for recusal. *See LaMontagne Builders v. Brooks*, 154 N.H. 252, 263 (2006). Therefore, we cannot say that the trial court erred in denying the plaintiffs' motion to recuse.

> *Affirmed in part; vacated in part; and remanded.*

DALIANIS, C.J., and DUGGAN, CONBOY and LYNN, JJ., concurred.