# United States Court of Appeals
## For the First Circuit

Nos. 12-1110; 12-1185

CONTOUR DESIGN, INC.,

Plaintiff-Appellee,

v.

CHANCE MOLD STEEL COMPANY, LTD.,
a/k/a Chance Mold Company, Ltd.;
EKTOUCH COMPANY, LTD.,

Defendants-Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph N. Laplante, U.S. District Judge]

Before

Thompson, Selya, and Dyk,*
Circuit Judges.

Kathryn Grace Spelman, with whom Daniel H. Fingerman, Daniel S. Mount, Kevin M. Pasquinelli, Mount Spelman & Fingerman PC, Peter G. Callaghan, and Preti Flaherty Beliveau Pachios PLLP were on brief, for defendants-appellants Chance Mold Steel Company, Ltd., a/k/a Chance Mold Company, Ltd., and EKTouch Company, Ltd.
Lawrence L. Blacker for plaintiff-appellee Contour Design, Inc.

September 4, 2012

_____

*Of the Federal Circuit, sitting by designation.

**DYK**, **Circuit Judge**. In this trade secret misappropriation and breach of contract case, defendant Chance Mold Steel Co. ("Chance")[1] appeals from a permanent injunction and from a jury award of damages. The injunction, based on a finding of contract breach, prohibits Chance from selling, displaying, manufacturing, or assisting others in manufacturing a number of ergonomic computer mouse products.[2] We use the shorthand "selling" or "sale" to refer to the injunction's operative terms. The injunction barred sale of specific products that were materially identical to products Chance had previously manufactured for Contour Design, Inc. ("Contour") and a new product (not previously manufactured for Contour) known as the ErgoRoller.

Chance challenges the scope of the injunction, arguing that the ErgoRoller should not be enjoined, and the duration of the injunction with respect to the other products. Chance also contends that the jury improperly awarded lost profits damages.[3]

---

[1] Defendant EKTouch Co., a company with the same principals, business address, and telephone phone number as Chance, sells products manufactured by Chance. This opinion will use "Chance" to refer collectively to Chance and EKTouch.

[2] The injunction also required Chance to return various materials belonging to the plaintiff, including confidential electronic files and firmware.

[3] In its reply brief, Chance objects to other aspects of the damages award, but Chance has waived this argument by failing to raise it in its opening brief. See DeCaro v. Hasbro, Inc., 580 F.3d 55, 64 (1st Cir. 2009) ("[C]ontentions not advanced in an appellant's opening brief are deemed waived.").

We reverse the injunction as applied to the ErgoRoller. We affirm the scope of the injunction as applied to the other enjoined products, and we affirm the damages award.[4]

## I. Background

Plaintiff Contour is a corporation based in New Hampshire (and incorporated in Delaware) that sells ergonomic computer mice. In 1995, Contour and Chance, a Taiwanese manufacturer, entered into negotiations for a contract whereby Chance would manufacture mice for Contour. In connection with the negotiations, Chance and Contour executed a non-disclosure agreement ("NDA") and a letter of intent on June 15, 1995. In the NDA, in exchange for receiving Contour's confidential information related to ergonomic mice, Chance agreed not to disclose this information to others and not to "duplicate, produce, manufacture or otherwise commercially exploit . . . product[s] derived from or based on" Contour's products. J.A. 157-58. The NDA expires on June 15, 2015.

On December 1, 1995, the parties entered into a manufacturing supply agreement, and for the next fourteen years, Chance manufactured mice for Contour, including the RollerMouse

---

[4] While the damages award encompassed Contour's lost sales as a result of Chance's marketing of the ErgoRoller, on appeal Chance makes no challenge to the damages award on this basis. We note that the evidence before the district court at the hearing on the injunction with respect to the ErgoRoller was different than the evidence presented to the jury for the award of damages; for example, the parties' stipulation that certain aspects of the ErgoRoller were independently developed was entered into after the jury trial.

Free.  As part of product development, Chance would work from a prototype to create electronic files representing its shape, and would use these files to create "molds" for mass production.  Over the course of their relationship, Contour paid Chance over $40 million.

Contour stopped placing orders with Chance in 2009, after Chance began to sell its own competing product, the ErgoRoller.  Thereafter, in a now-admitted violation of the NDA and trade secret law, Chance sold its existing inventory of Contour products to third parties and manufactured and sold materially identical versions of these products under different names (the "Classic," "Open," and "Professional").  Chance also continued to sell the ErgoRoller, but whether this violated the NDA or trade secret law is hotly disputed.  In December 2009, Contour sued Chance for trade secret misappropriation under the New Hampshire Uniform Trade Secrets Act ("NHUTSA"), N.H. Rev. Stat. Ann. § 350-B:1 to -B:9, and breach of contract (the NDA), challenging the sale of Contour's preexisting products and the sale of the ErgoRoller.

The district court granted a preliminary injunction, which required Chance to stop selling and recall inventory of the preexisting products and return their molds, but which did not extend to the ErgoRoller.  This court affirmed.  Contour Design, Inc. v. Chance Mold Steel Co., 649 F.3d 31 (1st Cir. 2011).  Thereafter, a jury found for Contour on its misappropriation and

contract claims and awarded $7.7 million in compensatory damages. The district court then granted exemplary damages for willful and malicious misappropriation as well as attorneys' fees. Contour Design, Inc. v. Chance Mold Steel Co. ("District Court Findings"), No. 09-CV-451, 2011 WL 6300622, at *15-17 (D.N.H. Dec. 16, 2011), ECF No. 228. Based on breach of the NDA, the district court also entered a permanent injunction until the expiration of the NDA on June 15, 2015, against the sale of preexisting products and the ErgoRoller. Id. at *17-21, 28-29; Contour Design, Inc. v. Chance Mold Steel Co. ("Permanent Injunction"), No. 09-CV-451 (D.N.H. Dec. 16, 2011), ECF No. 229.

Chance timely appealed the permanent injunction, challenging the inclusion of the ErgoRoller and its duration as to other products. We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1). Chance also timely appealed from the final judgment awarding damages, challenging the jury's award of lost profits, over which we have jurisdiction pursuant to 28 U.S.C. § 1291. We consolidated the two appeals. We consider first Chance's appeal of the injunction, and then the damages appeal.

## II. Injunction

With respect to the computer mouse products Chance marketed as the Classic, Open, and Professional, there is no question that Chance misappropriated Contour's trade secrets and is liable for that misappropriation; Chance does not appeal the

finding of misappropriation, the finding that the misappropriation was willful and malicious, or the entry of an injunction barring sale of the Classic, Open, and Professional (other than challenging its duration).  While Chance has clearly engaged in inappropriate corporate behavior in violation of state trade secret law and in breach of the NDA, the fact that some of its conduct was unlawful does not mean that all of its conduct was unlawful.  We cannot simply assume that all of Chance's actions are tarred by the same brush.

The central question here is whether Chance's attempted design-around, the ErgoRoller, was properly enjoined.  "We review a district court's grant of a permanent injunction for abuse of discretion; we review its underlying conclusions of law de novo and any factual findings for clear error."  The Shell Co. (P.R.) v. Los Frailes Serv. Station, Inc., 605 F.3d 10, 19 (1st Cir. 2010).  The permanent injunction was based entirely on Contour's breach of contract claims, not its trade secret misappropriation claims.  Interpretation of the NDA is governed by New Hampshire law.[5]

----

[5] A choice-of-law provision in the contract selects Colorado law, but the district court properly concluded that New Hampshire law applies.  A federal court sitting in diversity applies the choice-of-law rules of the forum state.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).  "Under New Hampshire law, '[w]here parties to a contract select the law of a particular jurisdiction to govern their affairs, that choice will be honored if the contract bears any significant relationship to that jurisdiction.'"  In re Scott, 999 A.2d 229, 237-38 (N.H. 2010) (alteration in original) (quoting Hobin v. Coldwell Banker Residential Affiliates, 744 A.2d 1134, 1137 (N.H. 2000)).  Here,

This issue arises against the background of <u>Bonito Boats, Inc.</u> v. <u>Thunder Craft Boats, Inc.</u>, 489 U.S. 141, 156 (1989), in which the Supreme Court held that federal preemption under the patent laws requires "that ideas once placed before the public without the protection of a valid patent are subject to appropriation without significant restraint" by state laws. At the same time, the Supreme Court has made clear that state contract law is not generally preempted. "State law is not displaced merely because the contract relates to intellectual property which may or may not be patentable." <u>Aronson</u> v. <u>Quick Point Pencil Co.</u>, 440 U.S. 257, 262 (1979). Private agreements may create liability for misappropriation of a product that "was not in the public domain" at the time of the agreement. <u>Id.</u> at 263. Similarly, "because the public awareness of a trade secret is by definition limited, . . . 'the policy that matter once in the public domain must remain in the public domain is not incompatible with the existence of [state law] trade secret protection.'" <u>Bonito Boats</u>, 489 U.S. at 155 (quoting <u>Kewanee Oil Co.</u> v. <u>Bicron Corp.</u>, 416 U.S. 470, 484 (1974)).

Here, the NDA imposes two obligations related to Contour's "Confidential Information" (defined as Contour's

---

the only alleged connection with Colorado is that the lawyer who drafted the NDA was in Colorado. Because Chance is unable to point to any "significant relationship" between the NDA and Colorado, we apply New Hampshire law to interpret the NDA.

"inventions, designs, methods, samples, market information, concepts and ideas") and "Product" (defined as "computer mouse products and related materials"). J.A. 157. First, it bars Chance from disclosing, copying, or using the Confidential Information without Contour's consent:

> [Chance] agrees (a) that it has maintained and will continue to maintain, and will subject . . . the Confidential Information to, processes and procedures designed to prevent the disclosure and protect the confidential nature of the . . . Confidential Information, (b) to treat as confidential and preserve the confidentiality of . . . all Confidential Information disclosed to [Chance] by [Contour] or otherwise coming into the possession or control of [Chance], (c) to make no use of . . . any Confidential Information except in connection with the Evaluation [to evaluate the desirability of entering a manufacturing agreement] without the prior written consent of [Contour], (d) to make no disclosure of . . . any Confidential Information to any party without the prior written consent of Owner, and (e) to not disclose . . . any Confidential Information to any employee or consultant who has not executed a confidentiality agreement on terms comparable to this Agreement, and (f) not to make copies or replicas of the Confidential Information . . . .

Id.[6] However, this confidentiality obligation does not apply to information that "now is or later becomes in the public domain other than as a result of a breach by [Chance]." Id. Second, in the NDA Chance "agrees that it will not duplicate, produce, manufacture or otherwise commercially exploit the Product, or develop any other product derived from or based on the Product,"

---

[6] This confidentiality obligation also extends to "the Product," but Contour does not rely on that restriction here.

without Contour's written agreement.  Id. at 158 (emphasis added). On each of these two theories the district court barred Chance from continued sale of the ErgoRoller.  In each instance we think the district court erred.

First, as to the use of Confidential Information, the parties stipulated that the ErgoRoller "software . . . . electronics and electrical design were independently developed and not derived from Contour's product or firmware."  Id. at 2032.  The district court concluded, however, that in making the molds for the ErgoRoller body, Chance used the confidential electronic files that had been used to make the molds for Contour's RollerMouse Free. District Court Findings, 2011 WL 6300622, at *18.  The district court based this ultimate finding on a number of subsidiary findings: (1) "the dimensions, features, and mechanical functionality of the ErgoRoller, while not identical to those of the Free, are palpably similar"; (2) the engineer who designed the ErgoRoller, Mhaco Chiang, "had access to the electronically stored files used to produce the molds for the Free"; (3) the development time for the ErgoRoller was shorter than it had been for any of Contour's products; (4) Chance failed to elicit "any positive evidence that Chance independently developed the ErgoRoller's design"; and (5) Mei-Ling Wang (Chance's general manager) refused to testify that the electronic files from the Free would not be

-9-

useful for making the ErgoRoller, despite her counsel's leading questions. Id. at *18-20.

Findings (1), (3), (4), and (5) are not supported by the record. The ErgoRoller and the Free are not "palpably similar." As the district court stated, "the ErgoRoller is overall squarer and more compact in design than the Free, . . . its profile is lower," it "has five buttons while the Free has only four, and the ErgoRoller's buttons are differently shaped from those of the Free." Id. at *6. As mentioned above, the parties stipulated that the ErgoRoller's software, electronics, and electrical design were not derived from the Free.

The record also does not support the finding that the development time for the ErgoRoller was unusually short: Steven Wang (Contour's CEO, no relation to Mei-Ling Wang) testified that the time from the start of development until commercial launch ranged from about one to three years for three of Contour's products, and Mei-Ling Wang testified that the time from the start of development until commercial launch was two years for the ErgoRoller. The fact that only six months were needed to create a working sample of the ErgoRoller does not suggest that the time for commercial development was unusually short.

It is also incorrect that Chance put forth no positive evidence of independent development of the ErgoRoller: Ms. Wang was asked whether it is correct that "the molds for the ErgoRoller were

-10-

made independently of any molds for the Free," and she responded, "That's correct." J.A. 2147. No witness testified to the contrary. Finally, Ms. Wang was not asked (and thus did not evade questions about) whether the electronic files from the Free would be useful for making the ErgoRoller. As discussed below, the only relevant testimony was to the contrary.

To be sure, trade secret misappropriation may be demonstrated by circumstantial evidence, such as access to the trade secret by the misappropriating party and similarity between the secret and the defendant's design, a theory on which the district court relied here. See Stratienko v. Cordis Corp., 429 F.3d 592, 600 (6th Cir. 2005) (citing cases from the Second, Third, Fourth, Seventh, Eighth, Ninth, and Federal Circuits); 4 Milgrim on Trade Secrets § 15.01 & n.16 (Matthew Bender & Co. 2012) (citing state and federal cases).[7] It is reasonable to assume that a similar standard would apply under the confidentiality provisions of the NDA. As the district court found, Chance had access to the confidential electronic files used to make molds for the

---

[7] Although the Supreme Court of New Hampshire has not discussed the use of the access-and-similarity test, it has stated that the NHUTSA "is New Hampshire's codification of the Uniform Trade Secrets Act (UTSA) . . . [and it] must be construed 'to effectuate its general purpose to make uniform the law with respect to the subject of [the NHUTSA] among states enacting it.' Therefore, opinions rendered by courts interpreting the UTSA[] . . . inform our analysis." Mortgage Specialists, Inc. v. Davey, 904 A.2d 652, 662 (N.H. 2006) (quoting N.H. Rev. Stat. Ann. § 350-B:8).

-11-

RollerMouse Free. However, as noted above, similarity between Chance's design and Contour's overall design was not demonstrated.

The district court speculated that "the electronic files used to produce the molds for the Free could be modified to produce molds for the ErgoRoller," District Court Findings, 2011 WL 6300622, at *20, but there was no testimony that they were in fact modified, or that they would even be useful for producing a product with a different overall shape. Rather, the only relevant testimony is that the electronic files for a new product are created from the final prototype of the new product, rather than being modified from electronic files from old products. And Ms. Wang testified that this was also true for the ErgoRoller: the prototype was created by an outside company, and the molding process was not started until April or May of 2009, which was after the prototype was finished in March 2009.

The only significant similarity between the Free and the ErgoRoller supported by the record is that both have a metal roller bar in a trough with an optical sensor that detects movements of the roller bar. But there is no evidence to establish any connection between this feature and the allegedly misappropriated information, the electronic files used to make molds for the Free.

Thus, the record does not support a finding that Chance used Contour's confidential electronic files to make the molds for the ErgoRoller, and the district court's finding to the contrary

-12-

was clearly erroneous. Contour's theory of misappropriation of confidential information fails.

The district court's other basis for enjoining the ErgoRoller was its conclusion that the ErgoRoller was "derived from" the RollerMouse Free. It is not clear how the district court interpreted the "derived from" language in the NDA, aside from reading it "to mean what it says." Id. Contour contends that this provision is a general non-compete provision, barring competition with Contour mouse products. There is no support for this theory in the agreement, which applies only to "derived" products. Furthermore, we doubt that a twenty-year worldwide non-compete agreement on all ergonomic computer mice with roller bars would be upheld under New Hampshire law, again suggesting that the agreement should not be interpreted to extend that far. Cf. Technical Aid Corp. v. Allen, 591 A.2d 262, 267-68 (N.H. 1991) (holding that a former employee could not be restricted from servicing any of the company's customers for eighteen months). We must therefore determine the meaning of the term "derived."

In patent law, to prove "derivation" under 35 U.S.C. § 102(f), the party asserting that the patentee "derived" the invention from another must show that the complete invention was communicated to the patentee; a partial disclosure is insufficient. See Eaton Corp. v. Rockwell Int'l Corp., 323 F.3d 1332, 1344-45 (Fed. Cir. 2003). We have no doubt that contracting parties may

agree that one party will not copy another's product, whether or not that product would qualify for patent protection. See Aronson, 440 U.S. at 262. Here, the prohibition on the sale of a "derived" product would cover such copying. But in this case, it is clear that the ErgoRoller is not simply a copy of the Free. As discussed above, the size, shape, and number of buttons are different, and the parties stipulated that the ErgoRoller software, electronics, and electrical design were independently developed.[8] Contour does not contend that the Free was copied or that the complete invention was derived from the Free. But Contour does argue that aspects of the ErgoRoller were derived from the Free.

In such circumstances, and absent more explicit language in the agreement, we think that the "derived from" language at the very least requires appropriation of some novel property of Contour's products, not the derivation of features of the Contour products well known in the art. This conclusion is supported by the NDA's exclusion of information in the public domain from its

_____

[8] In finding that the ErgoRoller was "derived from" the Free, the district court also relied on an e-mail from a Chance employee to a distributor, which described the ErgoRoller as "a former Contour Free." District Court Findings, 2011 WL 6300622, at *20; see J.A. 1371. But the employee in question, Ms. Tzu-Wen (Lynn) Lin, was a salesperson who was hired because she could speak English. The fact that a lower-level employee without corporate officer responsibility may have characterized the ErgoRoller as "a former Contour Free" is not significant given the other evidence of differences.

-14-

confidentiality obligations, as discussed above.[9]  Indeed, the district court recognized that there is not "any basis for enjoining Chance from making or selling products that are 'similar' to Contour's, insofar as those products do not misappropriate Contour's trade secrets or use its confidential information." District Court Findings, 2011 WL 6300622, at *28.

The record is clear that the ErgoRoller does not appropriate any novel features of Contour's products. As discussed above, the only significant similarity between the products is that both have a metal roller bar in a trough with an optical sensor that detects movements of the roller bar.  However, Contour failed to introduce evidence that these features were novel, and indeed there was evidence that computer mice with roller bars were disclosed in published patents that predated Contour's "invention." There is no suggestion that using an optical sensor would be anything but a common solution to detect motions of the roller bar, and the particular electronics used to operate the sensor were stipulated to be "not derived from Contour's product or firmware." J.A. 2032.

---

[9] We also note that extending the "derived from" language to non-novel properties of Contour's products might raise preemption problems.  As discussed above, a private contract may restrict copying of an idea that was not in the public domain at the time of contracting, but may not "withdraw any idea from the public domain." Aronson, 440 U.S. at 263.

Contour argues that having a roller bar that was removable was Contour's idea, but the NDA only prohibits Chance from producing a "product derived from or based on the Product," where "the Product" is defined as Contour's "computer mouse products and related materials." Id. at 157-58. None of Contour's commercial products utilized a removable roller bar. While some of Contour's prototypes did use a removable bar, the ErgoRoller was not similar to these products. See District Court Findings, 2011 WL 6300622, at *6 (stating that the ErgoRoller's removable bar "was not achieved by placing the roller bar on a hinged axle, as in the original prototype of the RollerMouse Free, but by placing the roller bar in a trough in which it slides and rotates freely"). In any event, Contour's CEO, Steven Wang, admitted that the idea of a computer mouse with a removable roller bar was disclosed in U.S. Patent No. 4,799,049, which issued in 1989, six years before the NDA was signed. Thus, there was no proof that any aspect of Chance's ErgoRoller product was derived from any novel feature of Contour's products.

In sum, the district court erred in extending the injunction to Chance's ErgoRoller product because the record does not support the finding that Chance breached the NDA in producing the ErgoRoller. However, we see no error in the duration of the injunction as applied to the other enjoined products. The district court granted an injunction based on breach of the NDA until June

15, 2015, which is the expiration date of the NDA.  This was not an abuse of discretion in light of the limited duration of the injunction.  See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 217 F.3d 8, 14 (1st Cir. 2000) (finding no abuse of discretion in the scope of a permanent injunction that "specifically enforces the contract" signed by the parties).

### III. Damages

Chance also appeals the jury's $7.7 million compensatory damages award, arguing that the jury instructions on lost profits were erroneous because they did not specify that "Contour must have been capable of manufacturing its products during the relevant period."  Appellants' Br. 44-45.  Chance failed to object to the jury instruction on lost profits at trial.[10]  "Absent adequate objections to the instructions, our review is for plain error," which is "rare indeed . . . in a civil case."  Sony BMG Music Entm't v. Tenenbaum, 660 F.3d 487, 503 (1st Cir. 2011).  We see no plain error here.  Plain error requires, among other things, that

---

[10] At the charge conference, the district court informed the parties, "I've given you copies of the instructions that I think incorporate your objections and proposals and my rulings on them . . . and I assume you'll want to make a record of whatever issues you want to make a record of . . . ."  J.A. 1705.  Contour raised a number of objections, including arguing for some changes to the lost profits section of the instructions.  Chance, responding specifically to this objection, stated, "We agree with the order the way it is presented."  Id. at 1720.  The court then said to Chance, "I've heard Contour's objections to the jury instructions. Do you have any objections you'd like to raise?"  Id. at 1721. Chance responded, "No, your Honor."  Id.

the instruction be clearly incorrect. See United States v. Brown, 669 F.3d 10, 28 (1st Cir. 2012). It was not.

In a breach of contract action, the New Hampshire Supreme Court "will uphold an award of damages for lost profits if sufficient data existed indicating that profits were reasonably certain to result" but for the breach. George v. Al Hoyt & Sons, Inc., 27 A.3d 697, 709 (N.H. 2011) (quoting Petrie-Clemons v. Butterfield, 441 A.2d 1167, 1171 (N.H. 1982)) (internal quotation mark omitted); see E. Mountain Platform Tennis, Inc. v. Sherwin-Williams Co., Inc., 40 F.3d 492, 502 (1st Cir. 1994). Unlike in the patent infringement cases cited by Chance, in which the patentee seeking lost profits must prove that but for the misappropriation it had "the manufacturing and marketing capability to exploit the demand," see, e.g., Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc., 637 F.3d 1269, 1287 (Fed. Cir. 2011), a distributor seeking lost profits from a supplier for breach of contract need only prove that it would have made the profits but for the breach.

Here, the district court instructed the jury that Contour seeks "lost profits as a result of Chance's alleged misappropriation in breaching the NDA," and that in order to award lost profits, the jury must find (1) that the profits "are reasonably ascertainable"; (2) that they "were not reasonably preventable by Contour"; (3) "that the lost profits were

-18-

proximately caused by the misappropriation"; and (4) "that Chance had a reason to foresee at the time the contract was formed that those lost profits would result from the breach." J.A. 1753-54. We see no plain error in these instructions. The fact that Contour did not produce its products itself did not preclude damages. But for the breach, it could have made the lost profits by employing another company to manufacture the products (as it had employed Chance initially), and Contour could then have profited by selling them. We thus affirm the jury award of damages.

## IV. Conclusion

For the foregoing reasons, we reverse the injunction as applied to Chance's ErgoRoller, affirm the injunction as applied to the other enjoined products, affirm the jury award of damages, and remand for further proceedings consistent with this opinion.

**Affirmed-in-part, reversed-in-part, and remanded. Appellee shall recover one-half its costs.**