Rockingham
No. 7242

R. J. BERKE & CO., INC. & a.

v.

J. P. GRIFFIN, INC. & a.

J. P. GRIFFIN, INC. & a.

v.

R. J. BERKE & CO., INC. & a.

December 30, 1976

*Sheehan, Phinney, Bass & Green* and *Joseph F. Devan (Mr. Devan* orally) for the plaintiff R. J. Berke Co., Inc.

*Griffin, Harrington & Brigham* and *Letoile, Murphy & O'Reilly* (of

Massachusetts) *(Mr. Lindsey R. Brigham* and *John R. Murphy* orally) for the defendants J. P. Griffin, Inc. and Aetna Casualty and Surety Company.

PER CURIAM.   These consolidated appeals involve contract disputes between J. P. Griffin, Inc., the general contractor and the R. J. Berke Co., a subcontractor. They arose out of the construction of a sewage treatment plant and related facilities for the town of Newmarket, New Hampshire.

The town of Newmarket and Green Engineering Affiliates, Inc., were joined as parties defendant in the cross-action of *Griffin v. Berke,* but those actions have been disposed of and form no part of the appeals. The two insurance companies provided bonds for the remaining principal parties.

The history of the dispute, as briefly as possible, may be summarized as follows:

On August 6, 1968, Griffin entered into a $1,047,650 general contract with the town to construct additions to the sewage treatment plant. The Aetna Insurance Company furnished bond. Green Engineering Affiliates, Inc., was designated as the engineer and authorized to act as the town's representative in construction matters. Griffin entered into a subcontract for Berke to perform certain work for a price of $225,000. The St. Paul Fire and Marine Insurance Company furnished bond. All parties agreed that the completion time was 540 days from August 6, 1968. From the beginning, the actual construction work did not go well. The engineer had estimated that 4,100 cubic yards of ledge would need to be excavated but the actual amount encountered was approximately 12,000 cubic yards.

Numerous disputes as to the adequacy of the performance of each party's contractual obligations arose and were compounded by personality clashes for which both were at fault. Griffin's complaints included charges that Berke failed to adequately man the job thereby causing delays; performed sloppy work; failed to cooperate with other construction personnel in matters of scheduling; and failed to timely pay subcontractors. Berke's complaints included charges that Griffin failed to pay for labor and materials as the job progressed; to pay for extras; to provide proper working conditions; to adequately prepare the work site; and to generally cooperate so that the work could be reasonably coordinated.

Friction between the two companies reached the point where on February 13, 1970, with a substantial amount of the contract performed, Berke walked off the job. Berke returned to work on March 16, 1970, pursuant to a "letter agreement" negotiated March 12, 1970. Under this agreement, Berke was permitted to return to the site and complete the contract on the following conditions: (1) its guarantee "to provide sufficient competent personnel and all necessary materials to complete [its] portion of the treatment plant immediately"; (2) a proviso that no further funds would be paid to the company until it demonstrated that it had made all past payments owed to its subcontractor Standard Plumbing and Heating Corporation; and (3) a proviso that no further payments would be made to Berke "until completion and final acceptance by the Engineer of the project." Troubles persisted even after Berke's return to the job site. Griffin charged that Berke again had failed to adequately man the job and was still not timely in its payment to its subcontractors. On June 3, 1970, Berke was ordered to cease all work and to leave the premises. Griffin thereafter called in various subcontractors to complete or correct Berke's unfinished work.

On March 11, 1970, the instant litigation was started by Berke through a bill in equity seeking payment under the bond issued to Griffin by the defendant Aetna. The petition alleged that the work was 97% completed and sought the balance due on the contract price. An amendment to the pleadings was filed on October 10, 1972, adding counts in assumpsit and quantum meruit and including a claim for "extras" and for additional unspecified damages.

Griffin filed a cross-action against Berke and its bonding company the St. Paul Fire and Marine Insurance Company. The action alleged inadequate performance by Berke and sought recovery for the damages incurred, including recovery for the penalty paid for failure to timely complete the contract.

The proceedings, heard by a Judicial Referee *(Blandin,* J.), were lengthy resulting in a voluminous record and many exhibits. The parties showed little inclination to reduce this complexity or to assist the trial court. The parties ignored the design of RSA 491:15 as succinctly set forth in *Concord General Mutual Insurance Company v. Haynes,* 110 N.H. 76, 79, 260 A.2d 99, 101 (1969), and the plaintiff filed 177 requests for findings and rulings and the defendant 993 such requests.

The trial court found that both parties had materially breached their respective contracts in substantially the manner alleged in their pleadings; that the construction delays occurring prior to the time of the letter agreement were attributable to these breaches as well as to the unanticipated ledge conditions and to personality conflicts for which both parties were at fault. It concluded that "justice in this equitable proceeding requires that neither recover from the other for damage suffered prior to the letter agreement."

The referee observed that the meaning of the letter agreement was "obscure" but construed it as an intent "to get the job done," and not "intended to revitalize the original sub-contract ... with its mass of provisions, some highly technical, contained in the hundreds of pages and integrated proposals and drawings." He further found that Berke breached the terms of the letter agreement and that Griffin was justified in ordering it to cease all work and leave the premises. The referee thus concluded that Griffin alone was entitled to damages arising after the letter of agreement.

The court ruled that the fair market value of materials and labor, including extras furnished by Berke, was $240,562.18; credits awarded Griffin included its partial payment to Berke in the amount of $170,377.20, plus $33,299.05 admittedly due by Berke, and post letter agreement damages of $27,457.64 (including $6,000 as Berke's share of liquidated damages for delay). The result was a net balance due Berke in the amount of $9,428.29.

Both parties have appealed from the verdict and all exceptions were reserved and transferred by *Bois,* J. Berke has indicated that it does not intend to press its exception should the appeal be resolved in its favor.

Griffin's contentions are fourfold: (1) Berke was not entitled to relief in quantum meruit; (2) Berke was not entitled to payment for the extras; (3) the referee erred in apportioning the liquidated damages for project time overruns; (4) the referee was in error in his method of determining the damages to be set off by Griffin.

## I.

Griffin's argument in contesting the recovery in quantum meruit is twofold. It argues that as a matter of law such recovery is not allowed (1) where substantial performance has not been

rendered and (2) where the defaulting party's breach has been willful.

In support of its first contention, Griffin relies on *Albre Marble & Tile Co. v. Goverman,* 353 Mass. 546, 233 N.E.2d 533 (1968), wherein it was held that substantial performance of the contract was a prerequisite to quantum meruit recovery. This position apparently is attributable to the strict view which Massachusetts generally takes towards quantum meruit recovery. *See* 3A A. Corbin, Contracts § 707, at 330-31 (1960).

Quantum meruit is a restitutionary remedy intended for use by contracting parties who are in material breach and thus unable to sue "on contract." *See* J. Calamari & J. Perillo, Contracts § 159 (1970); 5A A. Corbin, Contracts § 1124 (1964). It follows that the defaulting party recovering in quantum meruit will generally not have rendered substantial performance. We have permitted recovery to plaintiffs who have failed to substantially perform. *See Francoeur v. Stephen,* 97 N.H. 80, 81 A.2d 308 (1951); *Britton v. Turner,* 6 N.H. 481 (1834). There is no compelling reason to adopt a contrary position in this case.

As to the defendants' second argument it is true that generally quantum meruit recovery will not be awarded where the conduct has been "wilful." Corbin notes that the term is not easily defined, and that a breach is not ordinarily considered willful if there is involved an honest dispute as to contract obligation. *See* 5A A. Corbin, Contracts § 1123 (1964). It has been suggested that the quality of the breach bears no logical relationship to the theory of quantum meruit recovery, and that the willful defaulter should thus not be denied relief. Nordstrom & Woodland, *Recovery by Building Contractor in Default,* 20 Ohio St. L. J. 193, 211-14 (1959). In *Britton v. Turner, supra* at 492, the court emphasized the principle that "where the party receives value — takes and uses the materials, or has advantage from the labor, he is liable to pay the reasonable worth of what he has received."

We have spoken with approval of recovery for the plaintiff who "by his *voluntary failure* to fully perform the work he agreed to do" has conferred a net benefit on the defendant. *Anderson v. Shattuck,* 76 N.H. 240, 242-43, 81 A. 781, 782 (1911) (emphasis added). And in *Stanley v. Kimball,* 80 N.H. 431, 436, 118 A. 636, 638 (1922), we held unjust enrichment "a sufficient foundation" for permitting recovery. We have denied recovery to one whose conduct was "willful" where the plaintiff through a fraudulent

scheme had "bamboozled" the defendant out of a substantial sum of money. *Welch v. Coleman,* 95 N.H. 399, 64 A.2d 691 (1949).

The finding here that the plaintiff had been "sincere in wishing not to fail ... to complete a job he had agreed to do" does not support Griffin's charge of bad faith.

## II.

Griffin's broad contention is that extras should not have been considered as they were not claimed according to the terms of the contract. The court found that Griffin had "waived any rights it might have." It is suggested that the referee erroneously relied on a provision in the letter agreement stating that "no further discussions will be entered into on back charges, liabilities or other claims until final acceptance of the project ...."

Whatever its merits, the issue of waiver is irrelevant insofar as Berke's recovery is not on the contract but in quantum meruit. In the absence of some explicit understanding between the parties that quantum meruit for extras would be barred, *see Page v. Marsh,* 36 N.H. 305, 308-09 (1858), they were properly included in the calculation of the gross benefit conferred. *Cf. Danforth v. Freeman,* 69 N.H. 466, 43 A. 621 (1898).

## III.

The general contract called for completion no later than February 17, 1970, but in fact the project was not completed until November 29, 1970. As a result of the penalty clause Griffin faced a potential liability of approximately $29,000. Credits were obtained and Griffin settled with the town for $18,000. The referee found that "The fundamental causes of the delays ... were (a) gross miscalculation as to the amount of ledge to be removed. This was the fault of neither Berke nor Griffin .... (b) [p]ersonality clashes for which both were at fault; (c) breaches by both ...." Berke was held responsible for $6,000 of this amount.

Griffin argues strenuously that no apportionment should have been made, and that the record mandates a finding that all the delay for which it was penalized was due to Berke. This argument is based on its conclusion that no significant part of the delay could be attributed to its own conduct. It does not support this conclusion with any evidence as to how the referee's contrary conclusion was necessarily in error. If the full length of the delay is

apportioned evenly over the contract period, a substantial amount of the delay will fall in the pre-letter agreement phase of the work. Griffin has failed to show why its role in the pre-letter agreement period was not a factor in the overall delay and thus a proper basis for the apportionment of the liquidated damages.

## IV.

Griffin's final contention is that the referee erred in measuring the damages to which it was entitled. Specifically, Griffin argues that the referee erred in that his calculations (1) credited Berke with having completed the subcontract (2) treated certain credits owed by Berke substantively, rather than as mere "bookkeeping" devices (3) failed to include Griffin's expenses in completing Berke's unfinished performance.

It is true that the referee obtained Griffin's gross benefit by adding together the subcontract price and the value of the extras. However, the referee subsequently deducted from this figure Griffin's damages in completing Berke's unfinished work. With a construction contract of the type involved here, this method does not confer any unfair advantage. As we observed in a previous case involving a construction contract:

> "Estimating his liability under the contract completely performed at the contract price, the benefit received, for which he should pay on the basis of the contract, is conveniently ascertained by deducting from the contract price the damage occasioned by the builders' failure to perform the contract."

*Danforth v. Freeman,* 69 N.H. 466, 468-69, 43 A. 621, 623 (1898). *See also Anderson v. Shattuck,* 76 N.H. 240, 243, 81 A. 781, 782 (1911).

Similarly, we find no unfair benefit conferred on Berke by the manner in which the referee handled the "credits." These items constituted, and were treated as, mere bookkeeping devices.

Finally, we find no error in the referee's decision to award Griffin less than the full amount of its claimed expenses in finishing Berke's subcontract. It was not incumbent on the referee to accept Griffin's damage schedule at face value.

We acknowledge that our review of the above matters has necessarily been circumscribed by the virtually unmanageable nature of this case. The avalanche of proposed findings and rulings

— nearly 1,200 in number (not counting component parts), occupying 122 pages in the reserved case — placed a heavy burden on the referee. This excess, rehashing nearly every scintilla of evidentiary detail, was obviously intended to serve not as an aid to the trial process, but rather as "a device to ensnare [the trier of fact] into error." *Stella v. Curtis,* 348 Mass. 458, 461, 204 N.E.2d 457, 460 (1965).

Proposed findings and rulings, by providing a simple method of "presenting to the law court the questions of law arising on the facts proven, as distinguished from the evidence," should work to expedite the trial process. *Concord General Mut. Ins. Co. v. Haynes, supra* at 79, 260 A.2d at 101. "[E]very lawyer is an arm of the court and owes the cause of justice the obligation of refraining from submitting overburdensome improper Proposed Decisions which do not serve a client's posture . . . ." *Coratti v. State,* 307 N.Y.S.2d 103, 105 (Ct. Cl. 1969). This obligation of restraint was not met in the instant case.

This case demonstrates that the matter of requests to find facts is one of increasing difficulty to the trial court. RSA 491:15 states simply that if either party requests it, the judge shall "give his decision in writing, stating the facts found and his rulings of law . . . ." The purpose of this section is to provide a basis for presenting to this court the questions of law arising on the facts found by the trial court, as distinguished from the evidence. *Tilton v. Sharpe,* 84 N.H. 393, 151 A. 452 (1930). This purpose is fulfilled if the trial court files, in narrative form, the findings of essential facts which are sufficient to support his decision. *Oullette v. Ledoux,* 92 N.H. 302, 30 A.2d 13 (1943).

"Under all the circumstances of this case the findings which were made, considered as a whole, were consistent with the decree and warranted by the evidence." *Concord General Mut. Ins. Co. v. Haynes, supra* at 79, 260 A.2d at 101-02.

*Exceptions overruled.*

BOIS, J., did not sit; the others concurred.