Merrimack
No. 2011-219

AXENICS, INC. f/k/a RENTEC CORPORATION

v.

TURNER CONSTRUCTION COMPANY & a.

Argued: September 12, 2012
Opinion Issued: March 13, 2013

660

*David N. Cole*, of Hanover, by brief and orally, for the plaintiff.

*Pierce Atwood LLP*, of Portsmouth (*David A. Anderson* and *Mark B. Rosen* on the brief, and *Mr. Anderson* orally), for the defendants.

BASSETT, J. The defendants, Stryker Biotech, LLC (Biotech) and Stryker Sales Corporation (Sales) (collectively Stryker), and Turner Construction Company (Turner), appeal a ruling of the Superior Court (*McNamara*, J.) finding them liable on a theory of unjust enrichment and awarding damages to the plaintiff, Axenics, Inc. f/k/a RenTec Corporation

(Axenics). Axenics cross-appeals, challenging the amount of damages awarded and the trial court's failure to find the defendants liable on its breach of contract and New Hampshire Consumer Protection Act (CPA) claims, *see* RSA ch. 358-A (2009 & Supp. 2012). We affirm in part, reverse in part, vacate in part, and remand.

The trial court found, or the record establishes, the following facts. This case arises out of the construction of a biotech facility (facility) in West Lebanon. Biotech operates the facility, and Sales owns the property where it is located. Turner was hired as the general contractor to build the facility. Axenics provides "manufacturing, installation, and field services for ultra-pure gas and liquid distribution systems in the biotechnology, pharmaceutical, and semiconductor industries."

On April 15, 2004, Axenics entered into a subcontract with Turner to furnish labor, materials, equipment, and services for the installation of "process pipe" at the facility. The original subcontract price was $1,992,506. Both parties agreed that the facility would be completed as quickly as possible. The "mechanical completion" date for the facility, including the process pipe installation, was December 2004. Ultimately, Axenics' last day on the job was June 2, 2005.

The subcontract contemplated the possibility of delays and hindrances as well as changes to the scope of the work and its cost. The subcontract provided that "all instructions given to [Axenics'] supervisory or management personnel by Turner's Superintendent, Engineer, or other duly authorized representative shall be understood to be included as part of this Subcontract." If Axenics believed "work to be beyond the scope of" the subcontract, it was required to inform Turner before proceeding. In the event that the parties could not reach an agreement at that time, Turner could issue "an S.I.S. (Superintendent's Instructions to Subcontractors) for record purposes until such an agreement [could] be reached."

In the event that Turner directed additional work to be performed "and the value of such work [was] to be determined other than by actual signed tickets for material," Axenics was to "submit a lump sum proposal accompanied by an itemized breakdown of material, using established contract unit rates where applicable." The "lump sum proposal" had to be "accompanied by accurate written estimates of the cost" and "be submitted to Turner within five (5) calendar days of the receipt of the directive." If the "[p]roposals for additional work" were not received within five calendar days, Turner would "assign a fair and reasonable value for the additional work, and the additional work w[ould] become part of [Axenics'] scope of work."

Likewise, when Axenics initiated requests for changes to the work, it had to "provide [a] written request for change and obtain Turner's written

concurrence *before* proceeding with any Work believed not to be within the scope of [the] subcontract." The subcontract further provided that if Axenics was "delayed, obstructed, hindered or interfered with in the commencement, prosecution or completion of the" work, it was required to notify Turner in writing about what caused the delay within forty-eight hours "of the commencement thereof." Axenics also had to demonstrate that it could not have anticipated or avoided the delay and had "used all available means to minimize the consequences thereof." This notice was "an essential condition precedent to [Axenics'] rights in connection with any such delays, obstructive hindrances or interferences."

In addition, in the subcontract, Axenics agreed:

> that it shall not be entitled to nor claim any cost reimbursement, compensation or damages for any delay, obstruction, hindrance or interference to the Work except to the extent that Turner has actually recovered corresponding cost reimbursement, compensation or damages from the Owner under the Contract Documents for such delay, obstruction, hindrance or interference, and then only to the extent of the amount, if any, which Turner on behalf of [Axenics], actually received from the Owner on account of such delay, obstruction, hindrance or interference. Notwithstanding any term or provision herein to the contrary, [Axenics] expressly waives and releases all claims or rights to recover lost profit (except for profit on work actually performed), recovery of overhead (including home office overhead), and any other indirect damages, costs or expenses in any way arising out of or related to the [subcontract], including the breach thereof by Turner, delays, charges, acceleration, loss of efficiency or productivity disruptions and interferences with the performance of the work.

Axenics' "work [was] to be coordinated with the structural, architectural and [mechanical, electrical, and plumbing] services prior to fabrication," and "[p]roject coordination procedures [were] outlined in [an] attached project coordination plan." The project coordination plan provided that: (1) Turner was responsible for scheduling, facilitating, and controlling the "coordination process"; (2) the engineer was responsible for supporting and reviewing "design changes required due to field coordination issues"; and (3) Axenics was responsible for producing, maintaining, and approving "coordination drawings" as well as implementing "coordination[-]driven images."

Several delays, which affected Axenics' work, arose during construction of the facility. Some of the delays caused the schedule to be compressed and required Axenics personnel to work overtime to complete the work on time.

In addition, there were occasions when Turner requested changes to the process piping, which Axenics believed to be a "change in scope." When this occurred, Axenics was instructed to continue working and that "SISs [would] follow."

During construction, Turner met with Stryker weekly to review change order requests. Change order requests, as well as applications for payment, had to be approved by Stryker. Axenics submitted eight written change orders, which upon approval by Turner and Stryker, increased the contract price to $2,518,078. The change orders that increased the contract price contained the following language:

> Through acceptance of this Change Order, [Axenics] acknowledges that it has reviewed the progress of the Work related to this Project and the potential impact of the added work on the progress of the project in the future. As a result, this Change Order includes compensation to [Axenics] for any and all effects, delays, inefficiencies or similar demands associated with this Project and [Axenics] recognizes that there is no basis for any such claim in the future.

> Please note that all other terms and conditions of the subcontract remain unchanged and that all costs to maintain our original contract schedule with the inclusion of the adjusted scope of work as set forth by this change order are included within the lump sum change order amount stated herein.

Axenics later submitted a ninth change order, in the amount of $435,929, which it characterized as a "Claim Settlement." The defendants did not pay this change order.

In late 2004, a dispute arose when Axenics notified Turner of additional change orders related to delays and work that it believed to be outside the scope of the contract. Turner initially responded to Axenics' request with an email "rejecting the claim." However, during the next several months, Axenics worked with Turner to obtain payment from Stryker for these change orders. Stryker questioned some of the work for which Axenics sought payment and requested that Axenics submit backup documentation for its requests. Turner assisted Axenics in preparing a presentation for Stryker regarding the requested funds, and Axenics made its presentation to Stryker in April 2005. Before the presentation, Turner representatives provided Stryker with rebuttal to some of Axenics' requests for additional payment, but also told Stryker that it agreed with several of them. Subsequently, Stryker refused to pay Axenics the requested funds.

In November 2007, Axenics sued the defendants, asserting that Turner had breached the subcontract when it failed to pay Axenics sums due.

Axenics also brought claims against Turner and Stryker for violation of the CPA and unjust enrichment. It sought $1.7 million in damages for materials, labor, equipment, and services as well as enhanced damages under the CPA and attorney's fees. In response, the defendants counter-claimed, alleging breach of contract and violations of the CPA.

At the conclusion of the eighteen-day trial, in its post-trial memorandum Axenics alleged that "Turner deviated from the . . . subcontract . . . in so many material respects" that Turner had "abandoned the [s]ubcontract, and [Axenics], rather than declaring breach, continued working." According to Axenics, this reflected the parties' mutual agreement to abandon the subcontract, making unjust enrichment "available to compensate [Axenics] for the benefits it conferred on Turner and Stryker through its work at the" facility. Axenics further alleged that Turner breached the subcontract by intentionally delaying payments and failing to coordinate Axenics' work with that of the other subcontractors, which hindered and delayed Axenics' performance of its contractual duties.

The court issued a lengthy decision in which it found that neither party had abandoned the subcontract and ruled against Axenics on its breach of contract claim. However, the trial court ruled in favor of Axenics on its unjust enrichment claim, concluded that the defendants were jointly liable, and awarded Axenics $1,080,000 in restitution damages. With respect to Axenics' CPA claim, the court ruled "that neither Stryker's nor Turner's actions" violated the CPA. Finally, the court ruled against the defendants on all of their counterclaims, including their request for attorney's fees. This appeal and cross-appeal followed.

On appeal, the defendants argue that the trial court erred in allowing Axenics to recover "in unjust enrichment because a valid, express contract governed the precise subject matter of Axenics' unjust enrichment claim, and that contract was neither abandoned nor breached." They further contend that the court erred in finding them "liable for unjust enrichment when they did not receive a benefit that would be unconscionable to retain," and "the record was devoid of any evidence showing the value of any extra-contractual benefit [they] purportedly received." Finally, they argue that the court violated New Hampshire Rule of Evidence 408 by failing to exclude evidence of an offer to compromise.

Axenics cross-appeals, arguing that the trial court erred in failing to find that the parties had abandoned the subcontract. In the alternative, Axenics argues that the trial court should have found "that Turner breached the [s]ubcontract." Axenics also claims that, regardless of whether the subcontract was abandoned or breached, the trial court erred by not awarding it "damages measured by its costs plus reasonable profit, or $1.7 million." In addition, Axenics maintains that the trial court erred in failing to find that

the defendants violated the CPA. We first address the parties' arguments regarding abandonment and breach of contract and then turn to their arguments regarding unjust enrichment, damages, and the CPA.

### I. Contract Abandonment

■ Axenics argues that the trial court erred in failing to find that the subcontract was abandoned because it was "referred to by all parties on a 'guideline' basis if at all and was never adhered to by any of the parties." "Generally, contract abandonment occurs when both parties depart from the terms of the contract by mutual consent." *J.A. Jones Constr. v. Lehrer McGovern Bovis*, 89 P.3d 1009, 1019 (Nev. 2004); *see Young v. Barry*, 107 N.H. 294, 296 (1966). Abandonment "may be accomplished by express mutual consent or by implied consent through the actions of the parties." *O'Brien & Gere Technical v. Fru-Con/Fluor Daniel*, 380 F.3d 447, 455 (8th Cir. 2004) (quotation omitted) (applying Missouri law). "Where acts and conduct are relied on to constitute an abandonment, they must be positive, unequivocal and inconsistent with an intent to be further bound by the contract." *Fru-Con/Fluor Daniel v. Corrigan Brothers*, 154 S.W.3d 330, 335 (Mo. Ct. App. 2004); *see also Harris v. IES Associates, Inc.*, 69 P.3d 297, 308 (Utah Ct. App. 2003) ("A contract may be [abandoned] by acts or conduct of the parties inconsistent with the continued existence of the contract." (quotation omitted)); 17A AM. JUR. 2D *Contracts* § 528 (2004) ("A contract will generally be treated as abandoned when one party acts in a manner inconsistent with the existence of the contract and the other party acquiesces in that behavior."). Abandonment of a construction contract may occur because of "the aggregation of numerous changes to the contract over time." *Clarendon America v. General Sec. Indem.*, 124 Cal. Rptr. 3d 1, 6 (Ct. App. 2011).

■ "Abandonment of a contract is a mixed question of law and fact; what constitutes an abandonment is a matter of law, and whether there has been an abandonment is a question of fact." 17A AM. JUR. 2D *Contracts* § 529. *But see J.A. Jones Constr.*, 89 P.3d at 1019 ("The issue of whether contract abandonment has occurred generally presents a question of fact."); *Fru-Con/Fluor Daniel*, 154 S.W.3d at 335 (same). "We will not overturn the trial court's ruling on a mixed question unless it is clearly erroneous." *Hogan Family Enters. v. Town of Rye*, 157 N.H. 453, 456 (2008) (quotation omitted). If the court misapplies the law to its factual findings, however, we will review the matter *de novo. See id.*

■ In this case, there was no express agreement to abandon the contract. Rather, in support of its abandonment theory, Axenics points to specific instances where Axenics and Turner deviated from, or failed to follow,

provisions of the subcontract, and it argues that the parties' conduct evinced an intention to abandon the subcontract. We disagree. Although there were a number of change orders that caused the work and its cost to differ from that to which the parties originally agreed, the scope of the work — the installation of process pipe — did not change. *See Clarendon America*, 124 Cal. Rptr. 3d at 6 (finding there was no "evidence that an excessive number of changes to the scope of work resulted in abandonment"). In *Fru-Con/Fluor Daniel*, 154 S.W.3d at 335, the Missouri Appeals Court found that, despite a large number of changes, the parties had not abandoned the construction contract because the contract itself allowed such changes. Likewise, the subcontract in this case contemplated that there might be changes to the work and its cost. Importantly, the subcontract also provided for possible schedule adjustments, delay, hindrances, and obstructions. Accordingly, the fact that there were numerous change orders does not evidence the parties' intent to abandon the subcontract. Moreover, there is no evidence that either party failed to preserve its rights under the contract. *See Clarendon America*, 124 Cal. Rptr. 3d at 6 (finding no contract abandonment, in part, when underlying parties expressly retained rights under contract); *EMF General Contracting Corp. v. Bisbee*, 774 N.Y.S.2d 39, 43 (App. Div. 2004) (citing cases in which abandonment was found when parties took steps inconsistent with enforcing their rights under contract). Under these circumstances, we conclude that the trial court correctly determined that the parties did not abandon the subcontract.

### II. Breach of Contract

Axenics next argues that the trial court erred in failing to find that Turner breached the subcontract. Axenics maintains that the trial court conflated breach of contract with contract abandonment, "which led [it] to erroneously conclude that because it found no abandonment there was no breach, although the court's specific findings detailed numerous breaches." Thus, Axenics asserts that "the court failed to consider the elements of breach . . . and failed to consider whether Turner had breached the contract by any means other than abandoning it."

The defendants maintain that Axenics waived this issue by failing to raise it in its notice of cross-appeal. *See Progressive N. Ins. Co. v. Argonaut Ins. Co.*, 161 N.H. 778, 784 (2011). Axenics' notice of cross-appeal presented the question: "Did the Superior Court err in determining that the parties had not abandoned the subject Subcontract?" Supreme Court Rule 16(3)(b) provides, in relevant part

> While the statement of a question [in a brief] need not be worded
> exactly as it was in the appeal document, the question presented

> shall be the same as the question previously set forth in the appeal document. The statement of a question presented will be deemed to include every subsidiary question fairly comprised therein.

Because of the fashion in which the trial court addressed Axenics' breach of contract and abandonment claims, we conclude that Axenics' abandonment question fairly encompasses the issue of whether the trial court erred in conflating abandonment with breach of contract. *Cf. In re Juvenile 2003-187*, 151 N.H. 14, 16 (2004) (concluding that, under facts and circumstances of case, question of whether evidence of juvenile's *actus reus* was sufficient was "inextricably linked with, and fairly comprise[d] a subsidiary question to, the ultimate issue of the sufficiency of the evidence as to the juvenile's *mens rea* with regard to that action"). Accordingly, we will address this argument.

We agree with Axenics that the trial court conflated breach of contract and contract abandonment and, therefore, failed to rule specifically on Axenics' breach of contract claim. In its order, the trial court characterized Axenics' breach of contract claim as alleging "that Turner breached its contractual agreement by abandoning the contract." It then analyzed whether the parties had abandoned the subcontract, finding that "neither Axenics nor Turner expressed any intent to abandon the contract," and concluding not only that "the contract was not abandoned," but that Turner had not breached the subcontract.

 Whether the parties abandoned the subcontract, and whether Turner breached the subcontract, however, are two separate questions. As stated above, "contract abandonment occurs when both parties depart from the terms of the contract by mutual consent." *J.A. Jones Constr.*, 89 P.3d at 1019. On the other hand, "[a] breach of contract occurs when there is a failure without legal excuse to perform any promise which forms the whole or part of a contract." *Lassonde v. Stanton*, 157 N.H. 582, 588 (2008) (quotation and brackets omitted). Here, because the trial court conflated contract abandonment with contract breach, it failed to specifically address Axenics' claim that Turner breached the subcontract. We, therefore, vacate the trial court's finding against Axenics on its breach of contract claim and remand for the trial court to determine whether Turner breached the subcontract as alleged by Axenics. *See Barrows v. Boles*, 141 N.H. 382, 388 (1996) ("Whether conduct is a material breach is a question for the trier of fact to determine from the facts and circumstances of the case." (quotation and brackets omitted)). It is within the trial court's discretion as to whether it should hold an additional hearing.

*III. Unjust Enrichment*

■ The defendants argue that the trial court erred in ruling that they were unjustly enriched. "The propriety of affording equitable relief in a particular case rests in the sound discretion of the trial court." *Clapp v. Goffstown Sch. Dist.*, 159 N.H. 206, 210 (2009) (quotation omitted). Consequently, we review a trial court's equitable determination for an unsustainable exercise of discretion. *See id.* To show an unsustainable exercise of discretion, the defendants must demonstrate that the court's ruling was clearly unreasonable or untenable to the prejudice of their case. *Id.* Although the award of equitable relief is within the sound discretion of the trial court, that "discretion must be exercised, not in opposition to, but in accordance with, established principles of law." *Id.* (quotation omitted). We will first address the trial court's finding that Turner was unjustly enriched and, therefore, liable to Axenics.

*A. Turner*

The defendants maintain that the trial court erred in allowing recovery against Turner under the theory of unjust enrichment "because the precise subject matter of Axenics' claim — the Extra Work purportedly performed in completing the piping installation — was covered by the parties' contract." Axenics counters that it was entitled to recover under a theory of unjust enrichment because the extra work that it performed was outside the scope of the subcontract.

■ Unjust enrichment is an equitable remedy that is available when an individual receives "a benefit which would be *unconscionable* for him to retain." *Id.* (quotation omitted). It is not a boundless doctrine, but is, instead, "narrower, more predictable, and more objectively determined than the implications of the words unjust enrichment." *Id.* (quotation omitted). One general limitation is that unjust enrichment may not supplant the terms of an agreement. *Id.* It is a well-established principle that the court cannot allow recovery under a theory of unjust enrichment when there is a valid, express contract covering the subject matter at hand. *Id.* at 210-11; *see Singer Asset Finance Co. v. Wyner*, 156 N.H. 468, 476 (2007) (finding that, in absence of valid and enforceable contract, trial court properly entered summary judgment for plaintiff on unjust enrichment claim). This is so because "[r]estitution is . . . subordinate to contract as an organizing principle of private relationships, and the terms of an enforceable agreement normally displace any claim of unjust enrichment within their reach." RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 2 comment *c* at 17 (2011). Nevertheless, unjust enrichment

may be available to contracting parties if the benefit received is outside the scope of the contract. *Clapp*, 159 N.H. at 211.

■ We agree with the defendants that Axenics cannot recover against Turner under an unjust enrichment theory. The gravamen of Axenics' unjust enrichment claim is that Turner's failure to properly coordinate construction of the facility caused Axenics personnel to work overtime and to incur additional costs that it would not have had to incur in order to fulfill its obligations in a timely manner. This subject matter — Turner's responsibilities for coordinating changes to the work and Axenics' entitlement to payment for any resulting extra work it performed or extra costs it incurred — was addressed in the subcontract itself. Axenics does not argue that the ultimate contractual objective — installing process piping — changed during the course of the contract. Instead, it argues that to achieve that objective on time required extra work and costs. As laid out above, the terms of the subcontract expressly addressed the possibility of delays and hindrances as well as the process by which Axenics would receive payment for any extra work that it performed because of change orders. The subcontract also established a mechanism for proceeding when Axenics believed the "work to be beyond the scope of" the subcontract, and delineated Turner's responsibilities for coordinating changes to the work. Since the subcontract governed the subject of Axenics' unjust enrichment claim, and the subcontract was not abandoned by the parties, the trial court erred in allowing Axenics to recover against Turner under a theory of unjust enrichment. *See id.* at 211-12; *ADP Marshall, Inc. v. Noresco, LLC*, 710 F. Supp. 2d 197, 230 (D.R.I. 2010) (applying Rhode Island law and finding that subcontractor could not recover against general contractor under theory of unjust enrichment when majority of subcontractor's claims were based upon work that was within scope of parties' agreement).

Axenics argues that the parties orally modified the change order process set forth in the subcontract and that the extra work it performed pursuant to the modifications necessarily fell outside the scope of the subcontract. It asserts, therefore, that it is entitled to unjust enrichment damages. As discussed above, we disagree that the extra work performed fell outside the scope of the subcontract. Simply because the parties may have orally modified the change order *process* does not render the *work* Axenics performed after such modifications outside the scope of the subcontract itself.

Axenics further relies upon *R.J. Berke & Co. v. J.P. Griffin, Inc.*, 116 N.H. 760 (1976), in arguing that it is entitled to recover against Turner on a theory of unjust enrichment. In *R.J. Berke*, we held that *quantum meruit* is a restitutionary remedy available to a party that materially breaches a

contract, and thus, has no contract remedies. *R.J. Berke*, 116 N.H. at 764. This holding does not support Axenics' argument. Here, Axenics does not argue that *it* breached the subcontract, is therefore without contract remedies, and, consequently, would be entitled to recover the value of the labor and materials furnished under the breached subcontract. Rather, Axenics claims that "the parties orally modified the change order procedure for Axenics' extra work and that the extra work fell outside the scope of the Subcontract." Thus, *R.J. Berke* is inapposite.

Axenics' reliance upon *Puritan Mills, Inc. v. Pickering Construction Co.*, 262 S.E.2d 586 (Ga. Ct. App. 1979), is also misplaced. In *Puritan Mills*, the defendant entered into a contract with the plaintiff to construct loading docks. *Puritan Mills*, 262 S.E.2d at 587. Upon completion, the defendant sought recovery against the plaintiff in *quantum meruit* for expenses incurred resulting from a change order, which required the removal of rock. *Id.* The Georgia Court of Appeals found that "[t]he contract between the parties clearly set[] forth the work to be performed and none of the five items describing the work or the drawings reflect[ed] the removal of rock as a part of the contract." *Id.* Accordingly, since the contract did not contemplate the removal of rock, and there was no question that the plaintiff knowingly accepted the defendant's services in removing the rock, the court upheld the trial court's monetary award for the reasonable value of removal of rock. *Id.* at 587-88. Here, however, the subcontract addressed the subject matter of Axenics' unjust enrichment claim. Accordingly, we reverse the trial court's decision finding Turner liable to Axenics on its theory of unjust enrichment.

### B. Stryker

The defendants further argue that Axenics' "unjust enrichment claim [against Stryker] must fail as a matter of law because [Stryker] has paid for the contractual benefit it received — the construction of [the facility] according to [the] contract." They maintain that any benefit received by Stryker was both bargained and paid for and that Stryker, therefore, should not be required to "make restitution."

■ "The party seeking restitution must establish not only unjust enrichment, but that the person sought to be charged had wrongfully secured a benefit or passively received one which it would be unconscionable to retain . . . ." *Gen. Insulation Co. v. Eckman Constr.*, 159 N.H. 601, 611 (2010) (quotation omitted)). When, as here, no express contractual relationship exists between the parties, "a trial court may require an individual to make restitution for unjust enrichment if he has received a benefit that would be unconscionable to retain." *Pella Windows and Doors v. Faraci*, 133 N.H. 585, 586 (1990) (quotation and brackets omitted).

■ "[T]he circumstances under which an unjust enrichment claim may be brought by a subcontractor against an owner, absent privity, are . . . limited." *Haz-Mat Response v. Certified Waste Serv.*, 910 P.2d 839, 847 (Kan. 1996). There may be "special circumstances that would justify requiring the owner to pay," such as when the owner accepts "benefits rendered under such circumstances as reasonably notify the owner that the one performing such services expected to be compensated therefor by the owner." *Id.* However,

> [t]he general rule in this area is that a subcontractor who furnishes material or labor pursuant to an agreement with, or upon the order and credit of[,] a general contractor cannot recover against the property owner upon the basis of an implied promise to pay arising from the owner's receipt and acceptance of the benefit of the material and labor furnished.

*Great Plains Equipment v. N.W. Pipeline*, 979 P.2d 627, 641 (Idaho 1999) (quotation omitted); *see also A & V 425 LLC Contracting v. RFD 55th St.*, 830 N.Y.S.2d 637, 646 (Sup. Ct. 2007) ("It is a firmly established principle that a property owner who contracts with a general contractor does not become liable to a subcontractor on a quasi-contract theory unless it *expressly* consents to pay for the subcontractor's performance." (quotation and brackets omitted)).

■ Consistent with this rule, other courts have found that "[w]here an owner has fulfilled its financial obligation to a general contractor, a subcontractor cannot rely on the owner to satisfy the relationship between the subcontractor and the general." *DJ Painting v. Baraw Enterprises*, 776 A.2d 413, 418 (Vt. 2001) (collecting cases). This is so, in part, because "[t]he point of hiring a general contractor for a construction job is for the general to manage the job and hire the subcontractors." *Id.* at 419. "The owner pays the general contractor, but if the general does not pay the subcontractors, the subcontractors have the statutory lien mechanism to attach money as yet unpaid to the general contractor." *Id.*; *see* RSA 447:5 (Supp. 2012).

■ Here, there appears to be no dispute that Stryker has fulfilled its financial obligation to Turner. Nor is there any indication that Stryker accepted benefits under circumstances reasonably notifying it that Axenics expected to be compensated directly by Stryker rather than by Turner. While the trial court found that Stryker "thanked all of the subcontractors for staying on schedule despite several problems that occurred," the court's reliance on this finding to support its award against Stryker is misplaced. In our view, Stryker's expression of gratitude does not demonstrate that Stryker had knowledge that it would be directly liable to Axenics for the

cost of additional work requested by Turner; to the contrary, this finding arguably supports the conclusion that Stryker did not expect to pay additional sums directly to subcontractors such as Axenics. Thus, there is no evidence that Stryker accepted a benefit that would be unconscionable to retain. *See Pella Windows and Doors*, 133 N.H. at 586; *see also S & M Rotogravure Service, Inc. v. Baer*, 252 N.W.2d 913, 916-18 (Wis. 1977) (reviewing cases involving actions for money by subcontractors against property owners upon whose property subcontractor had performed construction work pursuant to agreement with general contractor and finding rationale to be that when "the defendant had paid another for the benefits conferred, . . . it was not inequitable to permit the defendant to retain the benefits without paying the plaintiff"). Indeed, as the trial court itself found, what Stryker "received was a project completed on time and in accordance with the contract specifications." Accordingly, we hold that the trial court erred in allowing Axenics to recover against Stryker under a theory of unjust enrichment. We, therefore, reverse its decision with respect to that issue.

In view of our rulings that the trial court erred in finding the defendants liable under the theory of unjust enrichment, we need not address Axenics' argument concerning the proper measure of damages under that theory.

*IV. Damages — Admission of Internal Memoranda*

The defendants argue that the trial court erred in admitting and considering as evidence of damages a communication regarding an offer to compromise in contravention of New Hampshire Rule of Evidence 408. Because this issue may arise on remand, we address it. *See George v. Al Hoyt & Sons, Inc.*, 162 N.H. 123, 138 (2011).

At trial, Axenics sought to admit an internal email memorandum composed by Turner, which listed possible contribution amounts from both Turner and Stryker toward a potential settlement with Axenics. The defendants objected on the ground that the memorandum constituted a statement made in compromise negotiations and, thus, was inadmissible under New Hampshire Rule of Evidence 408. The trial court overruled the defendants' objection, finding that because the memorandum "was never communicated to the . . . other side," it was not a statement made in compromise negotiations. In its final order, the court reaffirmed this ruling and relied upon the memorandum in its determination of damages.

New Hampshire Rule of Evidence 408 provides, in relevant part:

[E]vidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a

claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount.

Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

The Rule "states the basic proposition that evidence of compromise offers[,] compromise agreements, and conduct or statements made in compromise negotiations is inadmissible on questions of liability and damages." N.H. R. Ev. 408 Reporter's Notes. "The Rule . . . reflects both doubt as to the probative value of the fact of settlement and a policy to encourage settlements." *Id.*

To the extent that Axenics argues that the internal memorandum did not constitute a statement made to compromise the claim or during compromise negotiations, we disagree. The language in the memorandum demonstrates that the amounts listed were under consideration by the defendants as part of a settlement package to be submitted to Axenics. *Cf. Slattery v. Norwood Realty*, 145 N.H. 447, 450 (2000) (finding that statement was not offer to compromise disputed claim but was admission of contractual obligations). The trial court itself observed that the memorandum "suggests an 'offer' to settle the case."

We have not had occasion to address whether an internal memorandum, evincing an offer to compromise, which has not been disclosed to the opposing party, is protected under Rule 408. However, "[t]he [federal] circuits that have addressed this issue have agreed that internal memoranda, although not communicated to the opposing side, are encompassed within" the similar Federal Rule of Evidence 408. *Xcoal Energy & Resources, LP v. Smith*, 635 F. Supp. 2d 453, 454 (W.D. Va. 2009) (discussing cases from the Third, Fifth, Seventh, Eighth, and Eleventh Circuits). Conversely, in *Blue Circle Atlantic v. Falcon Materials*, 760 F. Supp. 516, 522 (D. Md. 1991), *aff'd on other grounds*, 960 F.2d 145 (4th Cir. 1992) (unpublished opinion), the United States District Court for the District of Maryland ruled that Federal Rule of Evidence 408 "does not apply to internal memoranda unless communicated to the other side in an attempt at settlement."

We now join the federal circuits in concluding that the policy objectives of Rule 408 weigh in favor of exclusion of internal memoranda prepared for the purpose of compromise negotiations. "The spirit of the Rule, as recognized by several circuits and as set forth in the commentary to the Rule, supports the exclusion of certain work product, internal memos, and other materials created specifically for the purpose of concili-

ation, even if not communicated to the other party." *Xcoal Energy & Resources, LP*, 635 F. Supp. 2d at 454 (quotation omitted). Accordingly, we hold that the trial court erred in admitting the internal memorandum outlining the defendants' possible contributions to a settlement with Axenics. Since we have found the internal memorandum was admitted in error, we further find that the trial court erred in relying upon it in assessing damages.

*V. CPA Claim*

Finally, Axenics challenges the trial court's conclusion that the defendants did not violate the CPA. "The trial court's findings of fact and rulings of law will be upheld unless they lack evidentiary support or constitute clear error of law." *George*, 162 N.H. at 129 (quotation omitted).

Axenics argues that the trial court's finding that the defendants' conduct did not violate the CPA was erroneous "as a matter of law because the court did not make adequate findings" and "merely jumped to an unsupported conclusion." Axenics maintains that Turner instructed it to perform extra work, which was necessary to complete the facility on time, and "then secretly subvert[ed] Axenics' legitimate efforts to be paid." Specifically, Axenics asserts that Turner assured Axenics that it would support Axenics' claims for payment from Stryker for the extra work performed and "then presented [a] rebuttal to Stryker without disclosing to Axenics the existence of the rebuttal or that Turner had given it to Stryker." According to Axenics, these actions constituted unfair or deceptive acts under the CPA. Axenics also argues that "[g]iven [the defendants'] business sophistication and the length and breadth of the steps each took to subvert, delay, and deny Axenics' claims, the only reasonable conclusion is that their [conduct] constitutes a willful or knowing violation of the [CPA]," entitling Axenics to exemplary damages. We note that the parties do not dispute on appeal that RSA chapter 358-A applies. .

 ██ RSA 358-A:2 (2009) states that "[i]t shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." We have previously recognized that, although this provision is broadly worded, not all conduct in the course of trade or commerce falls within its scope. *Id.* "An ordinary breach of contract claim, for example, is not a violation of the CPA." *Id.* (quotation omitted). In determining which commercial actions not specifically delineated are covered by the CPA, we have employed the "rascality" test. *Id.* Under the rascality test, "the objectionable conduct must attain a level of rascality that would raise an

eyebrow of someone inured to the rough and tumble of the world of commerce." *Becksted v. Nadeau*, 155 N.H. 615, 619 (2007) (quotation omitted).

 Here, the trial court found that Turner's conduct in attempting to rebut certain claims by Axenics for payment for the extra work it performed "may have been unjustified or inaccurate based on its own failure to coordinate, but neither Turner's nor Stryker's behavior rose to the level of rascality required under the" CPA. Although the court noted Axenics' allegation that "Turner *never* requested additional funds from Stryker" for the extra work performed by Axenics, it ultimately found that was "not the case." The court found that "Turner merely requested back-up from Axenics [to support its claims for payment] and provided Stryker with a rebuttal to some of Axenics' claims." Indeed, the court found that Turner provided documentation to Stryker concerning Axenics' claims for payment, "stating that many of Axenics' claims had merit." The trial court further found that:

> Although Turner's own documents suggest that it knew that Axenics' claim had value, Axenics did a poor job of documenting why its claims exceeded the amount bid. Moreover, both the documents introduced at trial and the public record of the litigation establish[ed] a level of brinkmanship and hard bargaining, by both sides, which is hardly commendable, but far from uncommon.

These findings are sufficient to support the trial court's ultimate conclusion "that the parties' conduct, in the context of the 'rough and tumble' construction business, did not violate the CPA."

Moreover, the record supports the trial court's findings that Turner made efforts to collect and organize back-up documents to support some of Axenics' claims for payment, and that Turner supported the validity of some of Axenics' claims for payment. In addition, trial testimony indicated that "there was no secret" that Turner was going to review the back-up. Although Turner did not inform Axenics that it was preparing a rebuttal to some of Axenics' claims because it believed it "had an obligation to Stryker to review the backup and present it to them," this conduct is not of the type proscribed by the CPA. *Cf. State v. Moran*, 151 N.H. 450, 453-54 (2004) (defendant violated CPA by inducing homeowners to enter into contract with him to install siding when he did not intend to perform work, and he made misrepresentations to homeowners in effort to avoid performing work or refunding deposit).

Axenics further contends that certain of the defendants' litigation strategies violated the CPA because they were "unfair" and were "designed

to further delay the adjudication of Axenics' claim and make the litigation prohibitively expensive." Assuming, without deciding, that unfair litigation tactics fall within the scope of the CPA, Axenics has failed to demonstrate that the defendants' litigation tactics in this case were so egregious as to satisfy the rascality test. Accordingly, we conclude that the trial court did not err in finding that the defendants did not act "in a way that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Boles*, 141 N.H. at 391 (quotation omitted).

*Affirmed in part; reversed in part; vacated in part; and remanded.*

DALIANIS, C.J., and HICKS, CONBOY and LYNN, JJ., concurred.